## SIMONS et al. v. UNITED STATES.

### No. 9292.

Circuit Court of Appeals, Ninth Circuit.

April 21, 1941.

Rehearing Denied May 22, 1941.

George F. Vanderveer, of Seattle, Wash., for appellants.

J. Charles Dennis, U. S. Atty., and F. A. Pellegrini and G. D. Hile, Asst. U. S. Attys., all of Seattle, Wash., for appellee.

Before GARRECHT, DENMAN, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

Appellants were indicted, convicted and sentenced for violation of Sections 338 and 88, Title 18, U.S.C.A., and Section 17(a)(1) of the Securities Act of 1933, 15 U.S.C.A. § 77q, as amended.

Numerous errors are claimed in the trial, but before considering these claimed errors, we turn our attention to appellants' thirty-fifth assignment of error, reading: "Because the Honorable Leon R. Yankwich had not been present during the taking of any of the testimony at the trial, he had no jurisdiction to instruct the jury or to rule upon the defendants-appellants' requested instructions, nor upon their motion for a new trial, or to pronounce judgment and sentence upon them; and in so doing he violated their, and each of their rights under Article V of the Amendments to the Constitution of the United States".

The trial of the defendants-appellants consumed over six months. After all testimony had been presented, and while the attorneys for the defendants were arguing the case to the jury, the trial judge presiding was suddenly stricken with a heart attack which incapacitated him from continuing the trial. Thereupon counsel for the defendants, the defendants individually, and counsel for the Government stipulated that the trial should proceed before the Honorable Leon R. Yankwich, United States District Judge for the Southern District of California, who was, at the time, duly authorized to sit and act officially in the Western District of Washington. In said stipulation all of the defendants and their counsel waived (quoting from the written stipulation) "any and all legal and constitutional rights which they may have or might have by reason of the substitution of the said Honorable Leon R. Yankwich for the said Honorable Edward E. Cushman".

Before Judge Yankwich proceeded with the case the following proceedings were had in open court: "The Court: * * * In this stipulation all the defendants and their counsel waive any question that may arise by reason of the fact—the stipulation is rather unusual; although it has arisen from time to time, I am going to ask—so, each of the defendants, as I call his name, to stand up and state for the record whether he understands the nature of the stipulation and waiving any right and assents to it, as applied to all."

The Court then asked each defendant separately whether it was his desire that the substitution be made, and whether he waived any question that could be urged by the procedure and whether he agreed to abide by the stipulation should it be carried into effect, and not to raise any question of legality. Each defendant answered all questions in the affirmative.

The record shows that before proceeding Judge Yankwich made the statement that he had "read the entire printed record in the case, including the exhibits, except such exhibits as have been summarized for the record, such as bank statements and the like".

The defendants and counsel then entered into a further stipulation "that the transcript of all the evidence in the cause has been furnished to the said Honorable Leon R. Yankwich and that the said Honorable Leon R. Yankwich has sufficient knowledge of the evidence to prepare the necessary instructions to the jury and to pass upon requested instructions."

The arguments of counsel were then completed before Judge Yankwich, and the jury was given its instructions.

Defendants place great reliance on the case of Freeman v. United States, 2 Cir., 1915, 227 F. 732, page 759, holding: "It is the opinion of this court that in a criminal case trial by jury means trial by a tribunal consisting of at least one judge and twelve jurors, all of whom must remain identical from the beginning to the end. It is not possible for either the government or the accused, or for both, to consent to a substitution either of one judge for another judge, or of one juror for another juror. The continuous presence of the same judge and jury is equally essential throughout the whole of the trial."

A reading of the entire opinion in the cited case shows that the Court based its decision on the premise that the right to a

jury trial as preserved by the United States Constitution may not be waived by an accused. This premise has been destroyed by the decision of the United States Supreme Court in Patton v. United States, 281 U.S. 276, 298, 50 S.Ct. 253, 258, 74 L.Ed. 854, 70 A.L.R. 263, wherein the Court held that "Article 3, § 2 [of the Federal Constitution], is not jurisdictional, but was meant to confer a right upon the accused which he may forego at his election. To deny his power to do so is to convert a privilege into an imperative requirement."

Since the right to a jury trial as preserved by Article III, Section 2 of the Federal Constitution is a privilege which the accused may forego at his election, it follows that all of defendants' arguments on this assignment of error, based upon Article III, Section 2, must fall.

It is further urged by the defendants that since a court of law must get its jurisdiction from the law itself—either the Constitution or a statute—and since jurisdiction cannot be conferred by the parties litigant, it follows that a determination by a judge who had heard only a part of the testimony is void unless it can be sustained by the authority of some statute.

A similar argument was made by the defendant in the Patton case, supra, wherein it was urged that the Court had no jurisdiction, in the absence of statute, to proceed without a jury. In reply the Supreme Court said (page 298 of 281 U.S., page 258 of 50 S.Ct., 74 L.Ed. 854, 70 A.L.R. 263), "By the Constitution, art. 3, § 1, the judicial power of the United States is vested in the Supreme Court and such inferior courts as Congress may from time to time ordain and establish. In pursuance of that authority, Congress, at an early day, established the District and Circuit Courts, and by section 24 of the Judicial Code (U.S.Code, tit. 28, § 41(2), 28 U.S.C.A. § 41(2), the Circuit Courts having been abolished, expressly conferred upon the District Courts jurisdiction 'of all crimes and offenses cognizable under the authority of the United States.' This is a broad and comprehensive grant, and gives the courts named power to try every criminal case cognizable under the authority of the United States, subject to the controlling provisions of the Constitution. In the absence of a valid consent, the District Court cannot proceed except with a jury, not because a jury is necessary to its jurisdiction, but because the accused is entitled by the terms of the Constitution to that mode of trial. Since, however, the right to a jury trial may be waived, it would be unreasonable to leave the court powerless to give effect to the waiver and itself dispose of the case. We are of opinion that the court has authority in the exercise of a sound discretion to accept the waiver, and, as a necessary corollary, to proceed to the trial and determination of the case with a reduced number or without a jury; and that jurisdiction to that end is vested by the foregoing statutory provisions."

On like principles we hold that since the District Court had jurisdiction of the subject matter pursuant to the provisions of 28 U.S.C.A. § 41(2), subject only to the controlling provisions of the Constitution, and since the right to a jury trial, including the right to have the same judge proceed throughout the trial, as preserved by Article III, Section 2 of the Constitution, is a privilege which the accused may forego at his election, it would be unreasonable to leave the Court powerless to give effect to the waiver. We hold that the Court has authority in the exercise of a sound discretion to accept the waiver, and as a necessary corollary, to proceed to the trial and determination of the case with the substituted judge.

Defendant urges, however, that he has not been accorded due process. As we have said above, the jurisdiction of the Court to try the case is subject to the controlling provisions of the Constitution. The Fifth Amendment to the Constitution provides that no person shall be deprived of life, liberty or property, without due process of law. We take it that any waiver of the defendant would be ineffectual if it went so far as to deny him due process of law.

Due process of law in a criminal proceeding has been defined as consisting of "a law creating or defining the offense, an impartial tribunal of competent jurisdiction, accusation in due form, notice and opportunity to defend, trial according to established procedure, and discharge unless found guilty". See 16 C.J.S., Constitutional Law, § 579, p. 1171, and cases cited.

Defendants' point is that the completion of the trial and sentence by a judge who had not personally heard the testimony is not a trial by a "court" according to established procedure.

Defendants' argument here seems to be based upon a misconception of what constitutes a court.

In Meldrum v. United States, 151 F. 177, 10 Ann.Cas. 324, this court was presented with the question of whether or not upon the death of a federal judge before whom a criminal cause was tried before a motion for a new trial had been passed on, his successor has the power to pass upon such motion and to render judgment on the verdict. In the cited case we pointed out (page 183 of 151 F.) that "The court remains the same, and the change of the incumbents cannot, and ought not, in any respect to injure the rights of litigant parties", and answered the question in the affirmative.

In the instant case the trial was carried to completion before the United States District Court. Upon the retirement of the trial judge who heard the evidence his successor thoroughly acquainted himself with the facts of the case and read the evidence. He was in every respect competent to instruct the jury upon the law of the case. Defendants have their remedy of appeal to this court in the event of any error of the judge in so instructing the jury. No claim of unfairness or prejudice is made by the defendants, and we fail to find any. We hold that the defendants were not denied due process in the proceedings in the trial court.

We turn, therefore, to appellants' remaining assignments of error treating them in the order treated by appellants in their briefs. They can best be understood by a brief recital of the allegations of the indictment. The indictment contains thirteen counts. The first ten counts charge the appellants and six others not parties to this appeal with having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises from persons whom they might induce to invest in one or more oil promotion enterprises in the States of Washington and California, and the use of the United States mails in execution of the scheme in violation of Section 338, Title 18, U.S.C.A. Each of said ten counts charges the mailing of a separate letter in pursuance of the scheme.

Counts XI and XII charge the defendants with having devised the scheme referred to, and by the use of the United States mails employing said scheme in the sale of securities, in violation of Section 17 (a) (1) of the Securities Act of 1933, 15 U.S.C.A. § 77q, as amended.

Count XIII charges conspiracy to violate the postal fraud statute and the Securities Act.

Very briefly, the fraudulent scheme or artifice as alleged in the indictment contemplated the following:

The defendants, residents of California, would go to the State of Washington and acquire oil leases on 135,000 acres of land. They would then organize four corporations, Peoples Gas and Oil Company, the Peoples Gas and Oil Corporation, the Peoples Gas and Oil Development Company, and the Peoples Drillers, Inc., and through these corporations as instruments of operation they would sell small fractional parts or units of such leases to investors by means of false representations.

The defendants would hold open meetings with investors and prospects and represent such leases to be very valuable oil properties, whereas the defendants knew that there were no prospects of obtaining oil or gas in commercial quantities therefrom. The defendants would sell the leases in small units first at $10 per acre and from time to time would arbitrarily raise the price until it reached $35 per acre.

In addition to the price per acre to be charged investors, the defendants would require a payment of $5 per lease unit as an alleged fee for recording the unit, whereas the defendants knew and intended that only a comparatively small number of the leases would be recorded and defendants intended to appropriate the balance of said payments.

After selling the investors as many as possible of said lease units, the defendants would further "reload" the investors by selling them shares of stock of the Security Petroleum and Royalty Corporation, Ltd., of Los Angeles, representing to the investors that the defendant Joshua F. Simons had acquired a block of said stock as his personal property and as a special favor to a fortunate few of the investors he would permit them to share with him in his good fortune, whereas in fact said Joshua F. Simons had not recently acquired a block of said stock as his personal property but he had, together with other defendants and associates, owned the corporation and all unissued stock since the incorporation and said corporation had had its selling permits and licenses cancelled in the State of California for similar false and fraudulent representations.

When the defendants should find investors with more money than they could be induced to invest in said leases and Security Petroleum and Royalty Corporation stock, the defendants would endeavor to take from such investors as much of such additional money as possible by selling them stock of the Peoples Drillers, Inc., and other securities of little or no value, and by borrowing sums of money from such investors on promissory notes of some of the defendants, which notes the defendants would not and did not intend to repay.

The defendants having collected from the investors as much money as practicable and having appropriated to themselves as great a part thereof as possible, the defendants would and did plan a further selling campaign by having the Peoples Gas and Oil Development Company authorize an issue of two and one-half million dollars face value of "Participations" to be sold to the public, with the plan of appropriating large parts of the money received from the sales to their own use.

Upon the trial the defendants Joshua F. Simons and William Markowitz were convicted on all thirteen counts, and the defendant Samuel Markowitz was convicted on the eleventh, twelfth and thirteenth counts. One other defendant was convicted on the eleventh, twelfth and thirteenth counts, but he is not a party to this appeal. None of the remaining defendants were convicted.

Defendant-appellants first urge that the court erred in admitting, and in refusing to strike, testimony relating to the sale of stock in Security Petroleum and Royalty Corporation.

It is urged that "the evidence showed, without contradiction, that the stock sold was Mr. Simons' personal stock, that no one but he had any interest in the sale of the stock, and that all the proceeds of the sale were paid to him, and that the evidence relating to the transaction was, therefore, immaterial to any of the allegations of the indictment".

We do not agree that the evidence of the sale of Security Petroleum and Royalty Corporation, Ltd., stock was immaterial to any of the allegations of the indictment. The indictment charged that it was part of the scheme to defraud that the defendants would "reload" the investors by selling them this stock. As we view it, it is immaterial who owned the stock, or who received the proceeds of the sale, assuming that it was all a part of the general plan to defraud. Nor did the fact that all of the defendants did not actively participate in the sale of the stock render the testimony inadmissible. Once a conspiracy is established, the act of any one of the co-conspirators in furtherance of such conspiracy may be properly given in evidence against all. Bannon & Mulkey v. United States, 156 U.S. 464, 15 S.Ct. 467, 39 L.Ed. 494.

Of course, if it were not proved that the sale of the stock was a part of the conspiracy, or in furtherance of the conspiracy, the defendants' point might be well taken. Terry v. United States, 9 Cir., 7 F.2d 28.

Let us, therefore, examine the evidence presented with respect to said stock.

First, it appears that the lease sales campaign of the defendants closed in April, 1936, but that the defendants maintained branch offices in charge of sales managers to make collections on the contracts for some time thereafter. It also appears that during this period the defendants were bending every effort to keep the sales force satisfied to assure their co-operation in collections.

Roy H. Calkins testified that he had been employed as a salesman to sell defendants' oil leases, and that at a sales meeting held during the latter part of the sales campaign the defendants told the salesmen that "the oil program we were on was just a trifle compared with programs to come; that there would be five programs; that the next one would be much larger; that every man on the sales force was being watched, and that the best men would fill the executive offices."

The witness Marvin Marshall Scott, another salesman, testified that the defendants William Markowitz and J. F. Simons addressed a sales meeting in the latter part of March or the first part of April, 1936, and that the defendant Simons "made a promise of a new program to follow, and said that after the sales campaign was over to stick around and go to work with them on the next campaign".

The witness Engler testified as to a sales meeting held in July, 1936, whereat Simons stated "that he was very sorry that the new program which he and his associate, William Markowitz, and which the Peoples

Gas and Oil Development Company hoped to have under way by that time had not materialized yet. However, they were working on it, and that they hoped to have in the very near future news for us relative to that program, but that, in the meantime, however, he would like so far as possible to maintain and to keep employed a nucleus of those he considered his better salesmen that had worked for him previously in the Peoples Gas & Oil Company, and that he had attempted to work out something whereby the salesmen could be employed and could earn themselves a livelihood during the intervening time that might be left before the new program previously referred to was put together and under way; That he had been associated with an organization known as the Security Petroleum & Royalty Corporation, Ltd., of California, and that company had purchased outright 120 acres of land in what was known as The Weed Patch field, or the Mountain View field of California; * * * that it was his desire to furnish employment to the salesmen, that he had a considerable portion of the stock of the Security Petroleum & Royalty Corporation, Ltd., and was to offer as an individual with no connection with the Peoples Gas & Oil Development Company, or Peoples Gas & Oil Company, or anyone else, but merely as an individual, a portion of the personal stock owned which he had in the Security Petroleum and Royalty Corporation * * *".

The witness Tusing, a branch sales manager, testified that he had discussed the matter of the sale of Securities Petroleum and Royalty Company stock with the defendant Simons, and that Simons had told him "not to press the sale of this stock, but to place it with those people who would probably do me the most good as far as keeping the contracts alive was concerned, and that those best members of my sales force, the ones I most desired to keep in the organization, would be permitted to handle some of this stock too".

The evidence would tend to prove that the scheme of selling the Security Petroleum and Royalty Company was devised as a means of effecting the general scheme to defraud. To carry out the defendants' general scheme to defraud it was necessary to keep their sales offices operating to make collections. The plan of selling the Security Petroleum and Royalty Company stock belonging to the defendant Simons

was devised to keep these offices open. We quote the testimony of Malcolm P. Christenson, another sales manager, in this respect: "He [defendant Simons] said the stock [Security Petroleum & Royalty Co.] was held by Mr. Toub, but was really the property of W. Markowitz and J. F. Simons. He said he disliked very much selling it because it was one of the things he possessed in the way of stock that he thought a lot of, but due to the excessive expense of keeping the office open throughout this period of rest between deals, with no sales going on, that a terrific expense made it feasible and necessary for them to part with a portion of it. * * *"

We hold that there was no error in admitting evidence regarding the sale of this stock.

Defendants complain, however, that the trial court limited the jury's consideration of the testimony to the defendants actually shown to have dealt with the stock. But this is not a matter of which the appealing defendants can complain. We hold that the testimony was properly admissible as against all the defendants. The fact that it was excluded from consideration as to some of the defendants can be of no prejudice to the appellants.

In passing we further note that the trial court, in an abundance of caution, in its instructions withdrew from consideration of the jury the allegations of the indictment relating to the Security Petroleum and Royalty Company transaction.

At the close of the government's case, the defendants moved to dismiss the indictment upon the ground that each count was duplicitous in that each count charged three separate and distinct schemes to defraud.

We do not agree with the defendants here. The indictment charged that the defendants devised a general scheme to defraud investors. The scheme was alleged to have consisted of various plans to attract investors. We think that the language of the Circuit Court of Appeals of the Seventh Circuit in the case of Worthington v. United States, 64 F.2d 936, 938, is apropos:

"In determining whether a criminal charge, drawn under section 338, title 18, U.S.C. (18 U.S.C.A. § 338), is bad for duplicity, it is necessary to differentiate between the scheme to defraud and the

means adopted to effectuate the same. If the charge sets forth more than one scheme to defraud, it is duplicitous. If, however, there is but one general scheme to defraud and numerous means for effectuating the same, it is not bad for duplicity. [Citing cases.] * * *

"The existence of several fraudulent ventures, into one of which an unsuspecting victim may be led, does not necessarily multiply the number of schemes to defraud. One possessed of a fraudulent scheme may set numerous traps into one of which he hopes and expects the unwary to walk. One victim may not be lured or tempted by a fig farm in Arizona and yet may fall for the prospective profits, captivatingly pictured, which might arise from the purchase, at a large discount, of an unsatisfied judgment. Still another unsuspecting victim may be induced to purchase a land contract for the sale of a lot in a subdivision at a reduced price, when he would not buy the lot at half that price. In short, the fraudulent scheme of the entrapper may be a single one, yet means to accomplish the fraud may be many."

The indictment charged that the sale of lease units was to be effectuated by certain misleading and false pretenses, representations and promises, which are thereafter described in detail in ten numbered paragraphs. One of these alleged false representations is, "that in addition to the territory in the Frenchman Hills district, said defendants also owned or held promising land in the Rattlesnake Hills district adjoining a commercially producing gas field; whereas, in truth and in fact, as the defendants then and there well knew, the said defendants and their companies did not own nor hold any land in the Rattlesnake Hills district nor any land adjoining a producing field, but only the highly unlikely Frenchman Hills tract."

Defendants contend that the government did not prove that this representation was false, in fact they argue that the evidence shows conclusively that the defendants did hold leases of land in Rattlesnake Hills.

In this connection the defendants requested and were refused the following instruction: "There is an allegation in the indictment that the defendant falsely and fraudulently represented that they owned or held certain land in the Rattlesnake Hills district. This, I instruct you to entirely disregard—first, because the evidence shows that the representation was true in fact; and second, because in the opinion of the Court the question whether the defendants owned land in the Rattlesnake Hills would be wholly immaterial to an investor interested only in the purchase of a lease in Frenchman Hills.

Instead the trial court instructed the jury, "This instruction as to the burden upon the prosecution as to every material allegation of a particular count does not mean that in the described scheme to defraud alleged or referred to in the first ten counts, it was planned by a defendant that all of the false representations and promises therein described were to be employed but you do have to be convinced by the evidence beyond a reasonable doubt, before you can lawfully return a verdict of guilty thereon, that such defendant devised or intended to devise a scheme to defraud by means of at least one of the false representations or promises described or referred to in such count."

Defendants allege error in the court's refusal to give their requested instruction and in the court's giving the instruction above quoted.

■ As to the requested instruction, we hold that there was no error in the court's refusal, first, for the reason that the evidence in the record is not conclusive of the defendant's claim that the representation was true in fact, and second, because of the language contained in the requested instruction regarding the materiality of the representation. We shall discuss the question of the materiality of the representation later.

The Government introduced evidence in support of their claim of the falsity of the representation in the form of testimony of the county auditor [official recorder] of Benton County, Washington, where the Rattlesnake Hills are located. He testified that he had examined the index to all instruments recorded in that county affecting real estate from January, 1925 to the time of the trial, and that there were no leases recorded for and on behalf of the defendants or their companies. After this evidence was introduced counsel for the defendants stated that the leases on Rattlesnake Hills were held in escrow, and maintained that testimony that there was no record of the same was not material to the charge. This statement of counsel, of course, was not evidence in the case. There-

after on cross-examination he elicited from another of the Government's witnesses testimony to the effect that the defendant Broome had entered into negotiations for leases in Rattlesnake Hills and that certain assignments of such leases had been placed in escrow to be released to Broome if and when drilling operations were started.

In this state of the evidence it was the function of the jury to determine whether or not the representations made by the defendants as to the Rattlesnake Hills leases were false. There was no error in refusing to give the requested instruction, in this circumstance.

As to the instruction given by the court and quoted above, the defendants complain that it makes the indictment duplicitous. We quote from their opening brief, "If it be true, as the jury was instructed, that you may charge a man with a scheme to defraud embracing ten, twenty, thirty or even fifty false representations and convict him of a scheme to defraud embracing only one such representation, then the indictment becomes an instrument of deception by which you may charge the accused with as many things as you like and leave him to guess which one you will attempt to prove". We cannot follow the defendants' argument here. They seem to contend that in proving a scheme to defraud by means of several false representations, every alleged false representation must be proved, and failure to prove the falsity of one will result in an acquittal. We do not agree. Apparently the defendants confuse the scheme to defraud, which is the gist of the offense, with the means adopted to effectuate that scheme.

We hold that there was no error in the court's instructing the jury that it was not necessary for it to find that all of the false representations and promises described in the indictment were to be employed, but that it was sufficient if it found that the defendants devised a scheme to defraud by means of at least one of the false representations described.

Defendants, however, complain that the court should have added to the quoted instruction language to the effect that the misrepresentation must have been material in the sense that it must concern some matter that might influence the intelligent judgment of the investor. They also complain of the evidence regarding the representations of ownership of Rattlesnake Hills leases above referred to, on the ground that "it is impossible to conceive how the ownership of such leases could possibly influence the intelligent judgment of an investor in Frenchman Hills leases".

We are of the opinion and hold that the trial court adequately instructed the jury as to the necessity that the representation be material. We quote from another of the court's instructions: "It is necessary that the government prove that the scheme or artifice employed by the defendants was of the kind charged in the indictment. It is not necessary that it be proved that the scheme and artifice included the making of all of the alleged false pretenses, representations and promises, but it is sufficient if any one or more of them be proved to have been made, *and that the same were designed to and would be reasonably effective in deceiving and defrauding persons with whom the defendants proposed to and did deal*". [Emphasis supplied.]

As to the materiality of the representation regarding the Rattlesnake Hills leases, we think the defendants' argument that it could not possibly influence the judgment of an investor in Frenchman Hills leases is disproved by the testimony of Clarence C. Coble, an investor, who testified that the representation that the defendants had leases in Rattlesnake Hills was "the one thing that persuaded me to come into it". Let us also quote from the testimony of the witness Fisher, one of the company's sales managers:

"On one occasion at a sales meeting Mr. Broome * * * told about the manner in which he had found the leases and of the wonderful opportunity that Frenchman Hills presented; that in his opinion Frenchman Hills was going to bring forth one of these days one of the biggest producing fields that he had ever seen. * * * that because of the uplifts and anticlines and gas seepages they had discovered in that territory and its adjacency to Rattlesnake Hills, which was producing gas which in his opinion was coming from Frenchman Hills * * * he thought Frenchman Hills was an exceptionally good structure and worthy of a test by drill. He said that in his opinion Frenchman Hills was the so-called mother pool or the source from which the gas in Rattlesnake Hills originated. Mr. Broome pointed to the map in the broadside and said that they

not only owned and controlled the 135,000 acres in Frenchman Hills, but also owned and controlled that block of acreage down at Rattlesnake Hills, *so that in the event the pool traced down there,* if, as and when they discovered oil in Frenchman Hills, *they had that structure down there to drill also and that it would be put into the project.*

"In the latter part of May or June, 1934, I asked Mr. Simons if I should discuss the question of whether or not we owned property in Rattlesnake Hills, *and he said they had leases there and would add those or join them one of these days to their present holdings.*" [Emphasis supplied.]

 In view of this testimony it seems apparent that there was a question for the jury as to whether or not the representation of ownership or control of the Rattlesnake Hills leases would influence the judgment of an investor in Frenchman Hills leases. The jury was properly instructed that the representation must be material. There was no error here.

The above discussion also disposes of the second reason for our holding that there was no error in the court's refusal to give the instruction quoted above. By the proposed instruction the court was requested to hold as a matter of law that "whether or not the defendants owned land in the Rattlesnake Hills would be wholly immaterial to an investor interested only in the purchase of a lease in Frenchman Hills". This, we think, would have been error.

Defendants next claim error in the admission of testimony of the witness Stowell regarding the sale of Club Arrowhead memberships.

One of the false representations charged in the indictment to have been made in connection with the scheme to defraud was "That the said defendants had come up to the State of Washington from California for the purpose of developing the natural resources of the former State", and that the defendants "had come to help the people of Washington keep their money at home by developing their own natural resources".

The witness Engler testified that it had been represented by the defendants that the defendants J. F. Simons and W. Markowitz "had been known in California through their real estate and natural resource efforts", and that the defendant Simons had

stated that "he had had experience in natural resource development in California".

On cross-examination counsel for the defendants elicited the following testimony from Engler, in an attempt to establish a defense of truth of this representation, "I examined the Club Arrowhead property in California, which had been developed by Mr. W. Markowitz and Mr. Simons. It was apparent from my examination that these men had taken a section, more or less, of raw mountain land and had beautified it by building clubs and roads and by bringing in water and building swimming pools, and then had sold it for home sites."

Defendants thereupon introduced into evidence as an exhibit a folder containing color photographs of the Club Arrowhead property. This was the first that Club Arrowhead had been mentioned in the case.

All of the testimony to which the defendants now object related to the methods of W. Markowitz and Simons in developing Club Arrowhead, one bit of evidence being to the effect that the defendant William Markowitz caused experienced salesmen to go out and have purchasers sign membership application blanks for an ostensible fee of $10 which were in fact $100 promissory notes.

 While it is generally improper to introduce testimony of unrelated fraudulent acts in a case of the kind before us, still we hold that there was no error in the admission of the evidence complained of. Defendants opened the door to this testimony when they attempted to set up a defense of truth to the representations that W. Markowitz and Simons were natural resource developers. When they attempted to make it appear that the Club Arrowhead project was a commendable enterprise, it was proper for the prosecution to show the full details of the transaction.

Defendants' next assignments of error relate to what we shall designate as the "Trobee transaction". The witness Staniford testified that he had represented Mr. and Mrs. Trobee in an attempt to have the defendant Simons refund the sum of $14,000 which the Trobees had paid him for a 640-acre lease at Frenchman Hills. We quote from the record of proceedings before the trial court, at the time the testimony was objected to: Counsel for the prosecution: "The purpose is to show as Mr. Staniford will later show, that he had conversations with Mr. Simons concerning

this 640 acres, which is located in Frenchman Hills in the drilling area, a whole section of land and Mr. Simons told him that Mr. Trobee had purchased this from him for $14,000.00 and that Mr. Staniford from time to time endeavored to get Mr. Simons to make a refund of the money, the $14,000.00, Mr. Simons professing that he was just as good a friend of the Trobee's as was Mr. Staniford, and that he was just as watchful of their interests, and he further stated to Mr. Staniford among other things that he advised against them trying to let go of this lease; that their new program would come along that would revive the interest in the project; that then they could sell and he would let them know when that time came, but they never did let them know; that subsequently the Trobees executed an assignment of this property to the Development Company and after a conversation Mr. Simons had with Mr. Staniford, in other words, the testimony as a whole is to show the sale of this property to the Trobees by Mr. Simons for $14,000.00 and * * *".

Defendants raise the same objection to this testimony as they do in regard to the evidence about the sale of Security Petroleum and Royalty Company stock—that the sale was a personal transaction between the defendant Simons and the Trobees and had nothing to do with the general plan to defraud alleged in the indictment. And as we said in our discussion of the assignments of error relating to the Security Petroleum and Royalty Company stock transaction, defendants' point might be well taken if there were no proof that the transaction here under consideration was a part of the scheme to defraud or in furtherance of the scheme.

In this connection it is well to note that the Court at the time of admitting the evidence objected to limited its consideration to the defendant Simons. But, as we said in discussing the Security Petroleum and Royalty transaction, if it should be that the evidence was admissible against all the co-conspirators, there could be no prejudice to defendant Simons in its admission against him. The appellants against whom the evidence was excluded, of course, have no right to complain.

It appears that the witness Staniford first met Simons in November or December, 1936. The lease sales campaign of the defendants closed in April, 1936, but the defendants were still maintaining their branch offices to make collections on their contracts at the time of the Staniford-Simons meeting. At the meeting referred to Mr. Staniford requested Simons to return to the Trobees the sum of $14,000 which they had paid Simons for some oil leases. Simons made reassuring comments with regard to the prospects of profit and success of the oil venture and told Mr. Staniford that if he knew the circumstances that attended the drilling that was in progress at Frenchman Hills he would recognize that the Trobees stood to receive a far larger sum than $14,000 if oil or gas should be discovered. Thereupon Mr. Staniford pointed out to Simons that the Trobees' interest appeared to be a lease of a particular section of land, and that even though the Frenchman Hills project should turn out well, still he could not understand how the Trobees would be entitled to share in the general improvement at Frenchman Hills in view of the fact that their lease covered only a particular section of land. Simons stated to Staniford that it was his opinion that the Trobees were in a position so that their interest was a part of the pooled interest, and promised to take the matter up with the proper parties when he returned to Seattle. Staniford next met Simons on December 11, 1936, and Simons handed him a document entitled "Assignment and Agreement" executed by the Peoples Gas and Oil Development Company with a blank space for the signatures of the Trobees. Simons stated to Staniford that he had ascertained that it was true that the original lease to the Trobees covered a particular section of land, and that he had caused the new instrument to be drawn that this particular section might inure to the benefit of the Peoples Gas and Oil Development Company and that the Trobees might receive a share in whatever might result at Frenchman Hills. The document was thereafter executed by the Trobees.

We are of the opinion and hold that there is sufficient evidence to connect the Trobee transaction with the general plan to defraud. First, it should be remembered that there was evidence in the case tending to prove the existence of a conspiracy to defraud investors by the sale of lease units. It should also be remembered that the Peoples Gas and Oil Development Company was one of the corporations organized by the defendants to carry out their fraudulent enterprise, and it

552

cannot be questioned that the act of the Company in executing the agreement referred to was the act of all the defendants. From the fact that this company participated in the transaction between Simons and the Trobees by accepting the acreage transferred to the Trobees by Simons and granting the Trobees a right to share in the Frenchman Hills project, it could properly be inferred by the jury that the Simons deal was not personal as between him and the Trobees, but that it was a part of the alleged fraudulent scheme concocted by the parties.

It should also be kept in mind that the testimony objected to was not as to the original transaction between Simons and the Trobees. In fact, there is no evidence in the record as to just what took place when Simons sold them the stock. The questioned evidence relates entirely to the transaction between Mr. Staniford and the defendant Simons in which Mr. Staniford was attempting to negotiate for a return of the $14,000 invested. This took place at a time when the defendants were in the process of making collections on their lease contracts. Any unfavorable publicity at that time might have ruined their plans, and the jury could well infer that the transaction with the Trobees was in furtherance of the general scheme to defraud.

We find no error in the admission of the testimony.

The court admitted testimony of the witness E. A. Cabrera to the effect that in 1934 he was employed by the defendants Simons and William Markowitz to pacify the Trobees in regard to another transaction involving $30,000, wherein the Trobees had purchased from Simons some bonds of Arrowhead Villas Club. Error is assigned to this testimony, and also to testimony of the witness Staniford touching upon the Arrowhead Villas transaction. First we shall consider the Staniford testimony.

The first mention of Arrowhead Villas by Staniford was made in his testifying as to his meetings with Simons in regard to the $14,000 matter discussed above. He testified that he had written Simons requesting a meeting, and then, "The first I heard from Mr. Simons was on the telephone * * * in which he acknowledged receipt of my letter and said that it would be convenient for him to discuss the subject matter of the letter with me in my office and set a date which was perhaps the

same day or possibly the next day when he came, and we made the usual amities [sic] in conversation and then took up the subject matter of my inquiries in the letter itself.

"Q. All right, sir, what was said? A. I told him that my reason for asking him the status of the $16,000 note—".

Counsel for the defendant thereupon interposed an objection to the effect that the witness was about to go into a foreign matter, saying, "Now, this $16,000.00 matter hasn't anything to do with anything Your Honor heard about yet."

The objection was overruled and an exception was allowed, the Court remarking that the witness was testifying as to one conversation and that the Court would not make an effort to pick it to pieces. The jury was instructed to disregard any part of the conversation not bearing on the issues of the case.

The witness then related that he told Simons that the reason he wanted to discuss the $16,000 which was secured by a deed of trust and wanted to discuss the further investment of $14,000 was that Mr. Trobee was suffering a malignant disease and that Mrs. Trobee had three boys to care for. He stated that he told Mr. Simons that he was prepared to be reassured as to the security back of the $16,000 note because he had made independent inquiry as to the value of the real estate in question and believed that the security was adequate, but that regarding the $14,000 investment in the oil development enterprise he was anxious to obtain a refund of that sum.

The other references by the witness Staniford to the $16,000 deal were of a like nature, one statement being that Simons had pointed out that interest on the $16,000 note had been paid promptly and regularly.

 There was nothing of prejudice related by Staniford regarding the $16,000 Arrowhead Villas deal. No charge of fraud was made, and furthermore the jury was instructed to disregard all parts of the general conversation being related not bearing on the issues of the case.

We turn, therefore, to the testimony of the witness Cabrera. He testified that in the early part of 1934 he was employed by Simons and William Markowitz to get in contact with the certificate holders of the Arrowhead Villas Mutual Service Corporation for the purpose of making collections on assessments and also having proxies exe-

cuted whereby the secretary could vote for the certificate holders. During his employment William Markowitz said to Simons in the witnesses' presence, "I think he [witness] is the logical man to send out there to talk to these people". It was later developed that "these people" referred to the Trobees. The witness was thereupon sent to Fresno to visit the Trobees with the instruction to tell them that $30,000 in Arrowhead Villas Club bonds which Simons and William Markowitz had sold them were gilt-edged bonds, paying 8%. Simons and Markowitz told the witness that somebody had talked with the Trobees telling them that the investment was not good, and that it was the witness Cabrera's job to keep them pacified. The suggestion was made that the witness tell the Trobees that he was a member of "Dr. Brieglieb's church", apparently to obtain the Trobees' confidence.

Again it should be noted that the conversation objected to took place at the very time when the conspiracy which was charged and proved was in its formation. It should also be noted that there is nothing in the record to indicate the circumstances under which the Trobees purchased the $30,000 Arrowhead Villas bonds. No charge of fraud is made, and on cross-examination the witness Cabrera testified that he had no knowledge of the Arrowhead Villas Club ever having defaulted in any obligation for principal or interest on the bonds. He also testified that the defendants Markowitz and Simons were directors of the corporation. In short, the only testimony in the record regarding this Arrowhead Villas Club transaction with the Trobees is the testimony of Cabrera that he was employed by defendants William Markowitz and Simons to "pacify" the Trobees, telling them that the bonds were "gilt-edged". There is no showing that this was not a true statement. While the proposition of law advanced by the appellants that it is improper to show unrelated fraudulent acts of the defendants is unquestionably correct, still it is not in point here.

■ It is our opinion and we hold that there was no error in the admission of the testimony. The conversation between Cabrera and the defendants Simons and Markowitz took place at a time very material to the cause of action alleged in the indictment. It tended to prove the close relationship existing between the defendants at that time. Furthermore, as was the case in the $14,000 transaction discussed above, the jury could well infer that the acts testified to were in furtherance of the general scheme to defraud. The testimony objected to related entirely to the efforts of the defendants to prevent any unfavorable publicity with respect to their actions at a time when any such publicity would be very detrimental to their plans.

■ The defendants' next assignments of error relate to what we shall designate as the Klo transaction.

It appears that the defendant Simons in June of 1934 was approached by Fisher, one of his salesmen, for some money. Simons told him that he didn't have any money, but wanted Fisher to "keep his eyes and ears open and learn of any salesmen who had customers who might be sold more leases for cash *because he needed the money desperately for the business*". [Emphasis supplied.] Fisher replied that he knew of a Mr. Klo who had already bought some leases and who had some more money to invest, but that he wouldn't invest it in leases, preferring an investment from which he could obtain interest. Simons asked Fisher how much money Klo had, and Fisher replied that it was around $3,000. Simons then remarked, "I hope I get it, I need it very, very badly."

Simons then instructed Fisher to try to sell Klo some Arrowhead Villas 8% bonds. As a result of these negotiations Klo purchased $3,000 of these bonds. Several weeks later Simons requested Fisher to attempt to get Klo to exchange the bonds purchased for Simons' personal note. Simons contacted Klo as requested, and the exchange was made.

Here again it is argued that the sale was a personal transaction between the defendant Simons and Klo and had nothing to do with the general plan to defraud alleged in the indictment. However, the indictment alleges that it was a part of the scheme to defraud that "when the defendants should from time to time find some investors with more money than they could be induced to invest in said Frenchman Hills leases * * * the said defendants would endeavor to take from such investors as much as possible of such additional money by selling to them * * * other securities of little or no value, and by borrowing sums of money from such investors on promissory notes of some of the said defendants, which notes the said defendants would not and did not intend to pay as promised".

True, there is no direct testimony tracing the funds received from Klo into the general funds of the co-conspirators, but we think it a tenable inference from the testimony quoted that the sale by Simons to Klo of the Arrowhead Villas bonds was in furtherance of the conspiracy. The evidence is overwhelming to prove a general scheme to defraud investors, and to the effect that the defendants were very closely associated with one another. Simons first requested information as to whether Klo would buy more leases "because he needed the money desperately for the business", and failing in that attempt he sought to take from Klo his surplus funds by whatever means he could. Upon learning that Klo desired an investment whereby he could get some interest, Simons decided upon the Arrowhead Villas bonds, and then later induced Klo to return the bonds in exchange for his own promissory note. The transaction occurred at a time when Simons was attempting by various methods to raise money for the carrying out of the general fraudulent scheme.

■ The witness Weaver testified that only a certain area at Frenchman Hills constituted a geological structure or anticline which could possibly imprison or store oil or gas. Thereafter, over defendants' objection he was permitted to testify that there were 63,520 acres "on structure", and 68,800 acres "off structure". Error is assigned as to the admission of this testimony. We quote from the defendants' opening brief: "The precise point of the objection is that nowhere does the indictment charge the defendants with misrepresenting the location of their Frenchman Hills leases. On the contrary, it is (tacitly at least) admitted in the indictment that the defendants owned exactly what they claimed to own but charged that the property as a whole was 'highly unlikely' * * * that 'chances of finding oil were remote' and so forth and so on. The testimony was, therefore, wholly foreign to the issue made by the indictment".

Merely to state the defendants' argument is to answer it. To prove a charge that "chances of finding oil [on the premises] were remote" it would be very material to show just how much of the acreage was "off structure". We find no error here.

The trial court admitted into evidence a copy of a letter written by George V. Whittle, the original of which Whittle testified he delivered to the defendant William Markowitz about October 15, 1936. Error is assigned as to the admission of the letter.

To fully understand this exhibit it is necessary to add to the recital as to the fraudulent scheme charged in the indictment.

One of the false representations charged was "That the said defendant H. Harry Meyers was a very wealthy man * * *; that so thoroughly convinced had the said defendant Meyers become of the vast potentialities of the said field that he had decided to pay out of his own ample funds all the costs of drilling the first oil well in the said district; that he was so paying out of his own funds all drilling expenses and would so continue until the well had been completed, and in the event the first well was not successful, he, the said defendant, would continue if necessary to drill additional wells * * *".

It is also charged that it was a part of the scheme "that when the collections on the still outstanding Frenchman Hills installment contracts should begin to dwindle, the said defendant Meyers would withdraw from the enterprise and disregard his promise to finish the well or wells on Frenchman Hills at his own expense; the said defendants would induce a number of the said investors to become directors of the said Peoples Gas and Oil Development Company and thereupon would leave the responsibility for further collections and drilling to them."

From the record it appears that at the outset the defendants organized the three corporations hereinbefore referred to, which for convenience we shall refer to as the Corporation; the Oil Company, and the Development Company. Apparently the Corporation was the holding company for the leases. The Oil Company was the sales agency and the Development Company carried on the drilling operations. Later the Corporation was merged with the Oil Company. A new corporation, called the Peoples Drillers, was then organized to take over the drilling operations. All the assets of the Development Company, including drilling equipment, except leases and leasehold interests, were transferred to this new corporation. The capital stock of the Development Company was increased and the stock of the company was exchanged for investors' leases, the investors becoming stockholders at the rate of 8 shares of stock for each acre of leasehold interest. On October 15, 1936, the Oil Company trans-

ferred to the Development Company the uncollected balances due on accounts receivable for leases sold, and the Development Company became liable for the completion of the drilling operations. At the same time the Peoples Drillers transferred back to the Development Company the drilling equipment with the stipulation that if the latter company ceased operations, the equipment was to be conveyed to the Peoples Drillers free and clear.

It is in connection with the October 15th transaction that the letter objected to in this assignment of error was written.

The first part of the letter calls attention to the tax problems involved in the contemplated deal. Then the author of the letter goes on to say:

"Now, again, the general public have been given to understand that Dr. Meyers will finish this well and upon such representation is it possible now to switch the responsibility of that to themselves, the Development Company, without individual approval and if such individual approval is not had, would it not be construed as having misrepresented the whole deal? You and I know very well that every salesman as well as the Peoples Progress have made capital of the fact that Dr. Meyers was drilling this well,—a man of means in California. It was upon the development of the well by Dr. Meyers that they bought the leases. Is it possible to now switch that responsibility without incurring misrepresentations? * * *

"To me it is an acknowledgment to the Government that it is an attempt to relieve Dr. Meyers of the responsibility of finishing the well. That he will not go through with it as promised the public at the time of the sale of the units of leases. In other words, it was started off on one representation which was not carried through and I do not believe that this is a tenable situation or one that we can afford to stand upon.

"Isn't the situation like this? Leases were sold upon certain representations and in the finals those representations were not met and Company 'A' said to leaseholders, 'We will turn our unpaid contracts over to you and you leaseholders go ahead now and finish your drilling'."

The witness Whittle testified that he delivered the original of the letter personally to the defendant William Markowitz, and that "He tore it up and threw it away and said, maybe, that I was crazy". Markowitz also asked the witness to destroy his copy of the letter.

The objection of the defendants to the admission of the letter was that it is incompetent, on the theory that the statements therein are merely opinions of the writer on matters which it is the province of the jury to determine. The defendants state in their opening brief, "And the fact that Mr. Markowitz merely destroyed the letter instead of quarreling with the author about it, certainly cannot be construed as an admission that he agreed with the author's opinions".

The court in overruling the objection instructed the jury "to limit their consideration of this exhibit to the defendant William Markowitz, and, only—it is a lengthy letter, single spaced and three pages at least and has a great many recitals and statements in it, and you would only consider recitals and statements in this letter insofar as they may enable you to understand what the defendant Markowitz said when he—the original of this letter was given him and he had read it and what he did, in determining what the reasons may have been if you are convinced, rather, beyond a reasonable doubt with his reasons for his action and what he said".

We think there was no error in the admission of the letter. The statements to the effect that the general public had been given to understand that Dr. Meyers would finish the well, and that it was upon the development of the well by Dr. Meyers that they bought the leases are not statements of opinion of the author of the letter, but were recitals of fact.

The trial court admitted the letter cautioning the jury that the statements therein contained were not to be considered as evidence except as they explained the actions of the defendant Markowitz upon reading the letter. In other words, it was left up to the jury to determine whether the act of the defendant in tearing up the letter and instructing the witness to destroy his copy tended toward an admission or a denial of the statements contained in the letter.

If, as the defendant argues in his brief, the entire circumstances surrounding the receipt of this letter indicated that the defendant actually disapproved of the statements therein, we can assume that the jury so found—and in this event the evidence was favorable to the defendant rather than prejudicial to him. If, on the other hand, the circumstances tended toward an admis-

sion by the defendant Markowitz of the truth of the statements contained in the letter, then there was no error in its admission.

We quote from 20 Am.Jur.Evidence § 570, p. 483: "As a general rule, when a statement tending to incriminate one accused of committing a crime is made in his presence and hearing and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny are admissible in a criminal prosecution against him, as evidence of his acquiescence in its truth. The basis of such rule is that the natural reaction of one accused of the commission of a crime or of implication therein is to deny the accusation if it is unjust or unfounded."

During the course of the examination of the witness Stowell he was asked how long he had worked for the Atkins Realty Corporation, another corporation in which the defendants had an interest. The question was objected to and the objection was overruled. The answer was that the witness had been so employed for a period of about three months. The witness was then asked whether the defendant William Markowitz had been in Los Angeles during that period of time. This question was also objected to as irrelevant and immaterial. The objection was overruled, and the witness replied that Markowitz had been in the Philippine Islands some of the time. Then the question was propounded as to what conversations the witness had had with the defendant Markowitz about that time. Over objection the witness replied, "Before Mr. Markowitz left for the Philippine Islands he explained to me that I should do the best of my ability to carry on the membership campaign, and he explained to me that he was going to Manila and the Philippine Islands * * * on a matter regarding a lottery, * * * and if the deal went through, that he might find place for me better than the one I had, at some place in the world or in the country."

The witness was also allowed over objection to testify that after the defendant Markowitz returned from Manila they had a conversation in which defendant Markowitz "explained to me that things were going along, the conditions were very good over in the Islands there; that he had made very good contacts and that—well I think that is just a repetition of what I have said, that it looked as though it was going to go along very nicely, this lottery".

The defendants assign error to the admission of and the court's refusal to strike the testimony regarding the lottery.

We find no reversible error here. It appears that the reference to the lottery in Manila was merely incidental to the witness' testimony regarding his employment in the sale of Club Arrowhead memberships, which testimony we have heretofore held was admissible to rebut the defendants' attempt to set up a defense of truth to the representations that W. Markowitz and Simons were natural resource developers. A reading of the entire record convinces us that this incidental reference could not have prejudiced the defendants in any way.

The defendants' argument that the testimony was an attempt by the Government to prove the commission of a wholly independent crime is not persuasive. The testimony quoted is the only thing in the record on the subject—the witness testifying that Markowitz had told him that he was going to Manila "on a transaction regarding a lottery". Markowitz' connection with the lottery was not attempted to be shown. As a matter of fact, there is nothing in the record to indicate but that the conducting of a lottery is within the law in Manila.

The witness Stowell [who originally was indicted as one of the defendants, the indictment thereafter having been dismissed as to him] was also permitted to testify over objection of the defendants on the ground of immateriality, that after he was indicted he saw the defendant W. Markowitz and asked him why he had been indicted and why he had not had any reply to telegrams and telephone calls since the indictment, and this, too, is assigned as error. According to Stowell's testimony, Markowitz replied that Stowell had nothing to worry about. That he and Simons were arranging affairs in Seattle so that within the next six or eight weeks he "would be washed out of the deal altogether". That he and Simons would assist Stowell with counsel and attend to matters so that he would not be implicated in the matter in any way, shape or form.

Counsel for the defendants insist that the insinuation of the testimony is that Markowitz promised to somehow "fix" the case. We do not follow the defendants here, for we find no such insinuation. The promise was nothing more than that Markowitz and Simons would assist Stowell with counsel and see to it that his name was cleared.

There was certainly nothing prejudicial to the defendants in the testimony.

■■■ Defendants' next assignment of error relates to what we shall designate as the "Broome conversations". Broome was indicted with the defendants, but was acquitted.

The witnesses Christenson and Engler were each permitted to narrate over the objection of the defendants certain conversations which they had with Broome in the months of May and July, 1937, before the termination of the conspiracy charged in the indictment. In the view that we take of the case, it is unnecessary for us to relate these conversations in detail. It is sufficient to state that the witnesses testified that they had told Broome of certain reports that they had received of improper operations of the lease properties by Simons and Markowitz, and that Broome had stated that he believed they were true. During the course of the conversations Broome told the witnesses that he had come to the conclusion that Simons and Markowitz were doublecrossing him, that they wanted to wreck the well and that they had tampered with the steering gear of his automobile in an effort to have him killed and that they had had him shadowed by a gunman from Kansas City and that he had resorted to all kinds of trickery to escape these threatened dangers. He also stated that he had in a lock box in Vancouver, B. C., under an assumed name, a document signed by the defendants Meyers, Simons, William Markowitz and himself that would prove the conspiracy that the Government was trying to establish and that Simons and Markowitz had better not try to doublecross him or he would produce that evidence. He further stated that he knew personally that Simons and Markowitz had collected better than $3,000,000 in money and that he knew where $600,000 of the oil company funds had been declared in dividends and placed in safe deposit vaults.

At the time of admitting the testimony referred to, the Court instructed the jury that they were to limit its consideration to the defendant Broome, stating on one instance: "The jury are instructed that * * * these statements the witness attributes to Broome, you have no right to assume that they were in any wise true, or there was any foundation for them so far as the other defendants are concerned, but you do have a right to consider what he said as affecting him, Broome. One man cannot confess for another, and when the plans of men go awry, whether the—their operations have been legitimate or illegitimate, it is only human nature for one man, if he is trying to clear his own skirts, to place the blame on somebody else. That is, it is human nature that a certain percentage of people—you have no right to consider what this witness said that Broome said concerning these other defendants as being in any wise true, because it is left to you whether the witness' testimony is true, but what he says Broome said, you cannot, so far as any other defendant in the case is concerned, except Broome, consider any part of it for any other purpose."

Again, the Court instructed, "that insofar as their accusations of these other defendants, you will give them no weight or consideration—limit your consideration of what the defendant Broome said at these conversations to the questions of his guilt or innocence in this matter".

After the conversations were completely narrated, motions to strike were made and denied, and the Court stated to defendants' counsel:

"You may prepare a written instruction. I am inclined to agree with you that the—only to this extent—that the only legitimate use that can be made of permitting testimony regarding what Christenson told Broome was to understand the effect of what Broome himself said after hearing what Christenson told him, and that I do not think the Court should be required to unscramble it as long as you have an opportunity to prepare a written instruction limiting the effect in that way.

* * * * * * *

"I direct the reporter, if you will again indicate the part that you are moving against, to write it up so you will have a full opportunity to request by written request for an instruction to cure this matter, if it is something that should be cured, at the earliest convenient time."

Again, the court told counsel for the defense: "The Court is prepared to amplify the instruction and point out to the jury positively and unqualifiedly that none of this abuse that is said to have been heaped by Mr. Broome on his alleged co-conspirators is any evidence that they were what he said they were."

No instructions on the subject were offered by the defense.

It should particularly be noted that Broome against whom the evidence was ad-

mitted is not a party to this appeal, and we are concerned only with any possible prejudice that might have resulted to the appealing defendants from its admission. Defendants insist that the evidence was improper even against Broome, and that being improper it was highly prejudicial to them.

We do not agree, in view of the statements of the Court to the jury at the time of the introduction of the testimony, not once but many times throughout the proceedings, that they should consider the evidence only in relation to the guilt or innocence of Broome, and in view of the further opportunity given by the Court to the defendants to present written instructions to cure any possible defect, that any possible prejudice resulted to the appealing defendants.

The record is overwhelming with evidence as to the guilt of the appealing defendants, and we shall not assume for the purpose of reversing the case that the jury disregarded the positive instructions of the court and considered Broome's statements as evidence of their guilt.

Furthermore, we do not agree with the defendants as to the impropriety of the evidence as against Broome. It should be noted that the conversations took place when the alleged conspiracy was still in effect. There were many statements which could have been taken as admissions of Broome's connection with the conspiracy. For instance, the statement that he had in his possession under lock box and key, under an assumed name, a document signed by Meyers, Broome, Simons and Markowitz that would prove the conspiracy, certainly linked him with the general scheme alleged in the indictment.

Two of the counts in the indictment allege the mailing of letters, signed by Broome, in furtherance of the general conspiracy, at dates subsequent to the conversations related. Certainly the evidence that Broome knew of the fraudulent scheme before he mailed these letters was very material as to these counts.

We find no error.

■ The witness Zimmerman, a Government accountant, testified that according to his examination of the defendants' books, they had made a profit of some $38,000 from recording fees.

As we stated in opening our discussion of the indictment in this case, a part of the scheme charged in the indictment was that in addition to the price per acre to be charged investors, the defendants would require a payment of $5 per lease unit as an alleged fee for recording the unit, whereas the defendants knew and intended that only a comparatively small number of the leases would be recorded and defendants intended to appropriate the balance of said payments.

With the allegation of the indictment in mind, the testimony of Zimmerman that the books of the company showed receipts of recording fees in excess of the disbursements in the sum of $38,000 becomes material.

Objection was made to the admission of the testimony because of the fact that the witness admitted that the books did not disclose the costs of executing the instruments. The Court thereupon quite properly pointed out that the testimony was as to what was disclosed by the accounts as they appeared on the books, and that "if the accounts were incomplete, that is a matter to develop or explain or take into account".

No evidence was presented on the subject of the costs of executing the instruments, and in finally instructing the jury, the Court included the instruction, "It is also charged in the indictment that as a part of the scheme to defraud the defendants planned to collect a $5.00 fee per lease 'for recording the sale'. The right to charge this fee is expressly covered by a provision of the lease purchasers' contract where it is referred to 'as a fee for the execution of the necessary instruments and the recording of said lease assignment'. Whatever may have been the purpose, the defendants had a right to exact this charge, providing they did not employ fraudulent methods in doing so. I instruct you, therefore, to disregard this allegation of the indictment also."

The defendants' rights were adequately protected by this instruction, and we find no error.

■ The last assignment of error argued by the defendants in their briefs is that relating to the testimony of the witness Whittle regarding certain changing of the records of the defendants' companies. The defendants' objection is that it was purely a matter of internal accounting and did not concern any leaseholders, and hence was immaterial in a charge of defrauding investors.

It may be true in the ordinary case that evidence of stock manipulations of a corporation would be of no concern to any one

but the stockholders of that corporation, or at any rate would be of no concern to persons in the position of the investors in the instant case, owning leases assigned to the corporation under a community plan of development.

However, as said by the trial court at the time of objection to similar testimony by the witness Munkers, "Standing alone, it probably would make no difference, but that is not the entire case".

It must be borne in mind that it was alleged in the indictment that the defendants organized the three corporations for the purpose of carrying out their fraudulent scheme. The evidence shows that the stock in all three companies had been issued to the appellants, and that the books and minutes of the corporations reflected this ownership until May, 1935, at which time, under the direction of the appellants, the records were altered and destroyed so as to show that the appellants owned the stock of the Oil Company and the defendants Broome and Meyers owned the stock of the Development Company. The witness Munkers testified that he was instructed by Whittle to "set the entry up because the State of Washington was coming in to investigate the books of the companies, and the companies had to be separated before that investigation".

A reading of the entire record convinces us that the records were manipulated by the defendants in an effort to conceal the true relationship of the co-conspirators—as an effort to "cover up" their fraud. As such, the evidence became admissible on the question of their guilt or innocence.

As we said in the first part of this opinion, the trial of the instant case consumed a period of over six months. The record before us is very voluminous, covering over 2,000 pages of printed transcript. The evidence taken covered a wide range of inquiry. The conspiracy is alleged to have lasted for a period of almost four years. It would not be surprising if there had crept into the trial certain phases of immaterial evidence. Some judges adhere closely to the strict rules of evidence, haul their sails close to the wind, as the yachtman would say. Other judges are liberal and nontechnical, in the admission of evidence. The extreme either way is not to be commended. With this thought in mind we have carefully gone over the entire case and we are constrained to say that while some extraneous matter has found its way into the evidence even against the high vigilance of appellants' counsel we cannot say but that the Court studiously saw to it that the whole story that made up the case was allowed to be intelligently narrated to the jury. The undisputed evidence in the case, entirely unattacked as to credibility, conformed to no other hypothesis than guilt. In such circumstance a new trial should not lightly be ordered on grounds of technical errors in ruling on the admissibility of evidence. See United States v. Trenton Potteries Co., 273 U.S. 392, 404, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989.

The judgment of the District Court is affirmed.