## McLENDON v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. November 5, 1924.)

No. 4063.

**1. Post office ⊂⊃35—That customers are sometimes defrauded held not to make business "scheme to defraud."**

The fact that one conducting a legitimate business, in part through the mails, sometimes defrauds his customers by misrepresenting his goods, does not make his business a "scheme to defraud," within Criminal Code, § 215 (Comp. St. § 10385).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Scheme.]

**2. Post office ⊂⊃48(4)—Indictment for using mails to defraud construed.**

An indictment charging defendant, who was a breeder of and dealer in dogs, with having devised a scheme to defraud, in execution of which he mailed circulars in which he misrepresented the dogs offered for sale or trade "in reference to their training, blood, ancestry and right to registration, and facts of registry and other facts," held to charge a definite scheme to defraud only as respects blood, pedigree, and breeding.

**3. Post office ⊂⊃35—Letter mailed must have some relation to scheme to defraud charged.**

Under an indictment charging use of the mails to defraud, it is not necessary that a letter alleged to have been mailed in execution of the scheme devised should have been capable of aiding in the victim's deception, yet if it relates solely to a particular transaction, which was no part of that scheme, though it may have been dishonest in some other way, guilt of the crime charged is not made out.

**4. Post office ⊂⊃49—Evidence held admissible in prosecution for using the mails to defraud.**

In the trial of a defendant charged with using the mails to defraud, testimony of other transactions of defendant is admissible, if it tends to establish the existence of the scheme to defraud charged in the indictment.

**5. Criminal law ⊂⊃783(2)—Instruction that testimony properly admitted for other purposes might be considered on the question of his credibility as a witness held not erroneous.**

Where testimony, which was contradicted by defendant as a witness, was properly admitted for other purposes, it was not error to instruct the jury that they might consider it on the question of defendant's credibility.

**6. Post office ⊂⊃49—Evidence held not to support charge as to use of mails to defraud.**

A charge that defendant, a breeder of dogs, falsely and fraudulently represented through the mails that certain dogs offered for sale by him were eligible to registry is not supported by evidence that one of several stud books for dogs refused their registry, where it refused all entries made or authenticated by defendant without regard to merit.

**7. Criminal law ⊂⊃1166½(1)—Jury ⊂⊃116—Discharge of jurors in open court for failure to convict held ground for challenge to panel and reversal of subsequent conviction by jurors of same panel.**

Discharge of jurors in open court for failure to convict in a criminal case held ground for challenge to the entire panel, and also ground for reversal of a subsequent conviction by jurors of that panel, who had knowledge of such action.

In Error to the District Court of the United States for the Western District of Tennessee; J. W. Ross, Judge.

Criminal prosecution by the United States against T. E. McLendon. Judgment of conviction, and defendant brings error. Reversed and remanded.

D. B. Puryear, of Memphis, Tenn. (T. J. Walsh, of Memphis, Tenn., on the brief), for plaintiff in error.

W. H. Fisher, Asst. U. S. Atty., of Memphis, Tenn. (S. E. Murray, W. H. Fisher, and A. A. Hornsby, all of Memphis, Tenn., on the brief), for the United States.

Before DENISON, MACK, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. McLendon was convicted of using the mails pursuant to a scheme to defraud. Penal Code, § 215 (Comp. St. § 10385). The indictment was in eight counts. The first one set out the general scheme and the mailing of one letter for the purpose of its execution. Each of the remaining counts stated the same general scheme and the mailing of another letter to another person in furtherance of it. One count was withdrawn from the jury; they found him not guilty on five counts, and guilty on counts 1 and 3; and he was sentenced to five years in the penitentiary under count 1, and three cumulative years under count 3.

[1, 2] McLendon was engaged in the breeding, buying, and selling of bird dogs. Like every other legitimate business, this gives the trader, if he is so inclined, opportunity to defraud one customer after another by misrepresenting the quality of his goods, or by the great variety of expedients occurring to an ingenious scoundrel; but it has never yet been thought that the "scheme

to defraud" of section 215 of the Criminal Code could be found in the mere succession of diverse swindles, unrelated save as they had a common stage. It is not set out in the indictment or claimed in the proofs that McLendon's business was not, in substantial part, legitimate and satisfactory to his customers; and so, if the indictment is to be held good, we must find in it an allegation of some general fraudulent scheme dominantly characterizing some part of his business.

In this respect it is not easy to be sure what the indictment means to charge. The first paragraph, after the introductory allegation that the scheme was for the purpose of defrauding all persons who might "be included in the description of persons interested in the sale, purchase, or trading of blooded and registered bird dogs," alleges that McLendon pretended to have for sale blooded bird dogs entitled to registration in the usual records and particularly in the "Field Dog Stud Book," and—without negativing these pretenses—proceeds with some allegations which are not sufficiently intelligible to be helpful. It then, in the next paragraph, states the scheme more in detail, as appears from the portion copied in the margin.[1] We cannot find in this language any description of a scheme to defraud sufficiently clear and definite to justify a prosecution for felony, save as it refers to the general subject of pedigree. The right to registration alluded to was not separate, but, according to trade practice, was dependent upon ancestry. So we interpret the indictment as charging a scheme to defraud upon this subject—blood, pedigree, breeding—and no other. We do not overlook the quoted reference to "other facts,

such as age, color, size, breeding condition," etc. We do not take this reference as characterizing the scheme intended to be charged, but rather as incidental to, depending on, and in aggravation of the underlying plan. To regard these recitals as words of primary description would destroy the identity of the definite scheme already carefully set out, and leave it without boundary.

Nor do we fail to observe the later allegation that the scheme was "also by false and fraudulent pretenses and misrepresentation to acquire possession of dogs, and fraudulently, unlawfully, and feloniously convert the same to his own use, and thereby deprive the true owner thereof." Not only are these charges too vague to be the basis of any prosecution, but there is no connection set out in the indictment, or otherwise obvious, between such a plan and the main one charged. There is no bond of unity between the two. To avoid thinking the indictment bad for duplicity, this last-quoted allegation must be disregarded as surplusage.

[3] The letter which constitutes the misuse of the mails must be a step in the attempted execution of the scheme charged in the indictment. It doubtless is not necessary that all, or even the main part, of the defendant's business should be of a fraudulent character, nor yet that the letter should be in any degree capable of aiding in the victim's deception (e. g., Shea v. U. S. [C. C. A. 6] 251 F. 440, 447, 448, 163 C. C. A. 458); yet if the only letter mailed related solely to a particular transaction, which was no part of that scheme to defraud charged in the indictment, and the letter could have no effect, direct or indirect, in furthering that scheme, even though that particular transaction may be dishonest in some other way, guilt of the crime charged is not made out.

Count 1 related to the Heddon transaction. McLendon advertised for sale two pointer dogs, with claims that they were good hunting dogs. Heddon saw the advertisement and sent to McLendon a questionnaire, to be filled out and returned by the latter, and McLendon did this, answering the several questions. The mailing of these answers by him constitutes the offense charged in this count. Excluding the matters clearly immaterial, and others which Heddon as a witness admitted were not material to him, there remained only the statements that the dog sent was a good "single finder" and would "back at sight." This

---

[1] "Defendant's scheme was general in its conception, being formed without necessary reference to specific individuals, but for the purpose of defrauding specific individuals as opportunity might arise, when the general scheme was made to fit the particular case in each instance, but without losing any of its general characteristics; and such scheme was to misrepresent the facts in regard to the dogs he proposed to sell and trade, in reference to their training, blood, ancestry, and right to registration, and facts of registration, and other facts calculated to prove interesting to traders, such as the age, color, size, breeding condition, etc., and thereby to induce trades in dogs whereby defendant should receive money and other property in exchange for dogs misrepresented by him in the above matters, the money and other property being far in excess of the value of the dogs exchanged and delivered by defendant, by reason of the failure of such dogs to measure up to the false representations made by defendant. This money and other property defendant planned to and did convert to his own use, refusing to refund and make good the representations."

was accompanied by McLendon's statement, which he also made with every sale mentioned in the indictment, that, if the dog was not satisfactory after five days' trial, he would take her back and refund the money. There was no statement having any relation to pedigree or breeding, and the price asked and paid was suitable for an unpedigreed ("cold-blooded") dog. Heddon was not satisfied. He testifies that he tried the dog once, the day after arrival; that she found some birds, but not enough; and that she would not retrieve. He sent her back, requesting the refund of the $75 he had paid, and said that, because the dog did not meet the specifications, he thought he should have also his express charges. He also said in the letter that, if McLendon had in the near future an "A-1 quail dog," he would like to try it. McLendon promptly sent him another dog, but without any representation as to quality, except that implied from Heddon's request. Heddon looked at the dog at the express office, refused to take it out, and the agent so informed McLendon, who, meantime, had sent Heddon his $75 check as a refund. Upon learning that the second dog was rejected without trial,[2] McLendon believed himself entitled to the express charges which he had paid on both dogs, stopped payment on his refund check, deducted those charges and refunded to Heddon the remainder—some $56.

This was the whole proof on this subject. Whether the jury might rightly have convicted McLendon of fraud in representing the first dog to be a good hunting dog, when he did not believe she was, we need not consider. This proof has no tendency to show the use of the mails in execution of a scheme to defraud his customers, wanting blooded dogs and registered dogs, by deceiving them as to matters of registration and pedigree. The request for an instructed verdict on the first count should have been granted.

We do not reach the same conclusion as to count 8. The letter here specified was in reference to a sale of a bitch to Wooten. This letter not only described her qualities, but named her sire and dam, and the dog to which she had been recently bred. These

---

[2] Heddon testifies, that after rejecting the dog and while the express agent was waiting McLendon's instructions, Heddon took the dog to feed and care for as an accommodation to the express company, and, thus having the dog in possession, he tried him out for hunting and found him unsatisfactory; but McLendon does not seem to have known this. Heddon's own charges for the care of the dog during this period form a part of the return express charges which McLendon was compelled to pay, and deducted from his refund check.

matters were all pertinent to the "scheme" of the indictment, and the letter was thus fit to operate in the execution of that scheme; and there was testimony tending to show that some of these statements were not true, to McLendon's knowledge. In connection with this is to be considered the whole body of testimony tending to show a substantial quantity of misstatements from him along these lines, either in representations to others or in his own records. Whether these were the errors and inaccuracies of a careless and not very literate man, or whether they were developments of the fraudulent scheme charged, was for the jury.

Much complaint is made of receiving evidence concerning fraudulent transactions other than those named in the eight counts. This evidence was of two classes. One pertained to incidents having no connection with blood or pedigree; for example, proof that McLendon bought a dog which he did not pay for, or of sales of dogs in connection with which there was no representation, direct or implied, as to blood or pedigree, was inadmissible at any time or for any purpose.

[4] The other class pertained to transactions which were fairly relevant to the existence of a scheme to defraud upon the general subject charged. These were admissible, not so much to show the intent which ought to be attributed to McLendon in the specific transaction named in the indictment, as to show the existence of the scheme; but it obviously did McLendon no harm to have the jury told, as it was, that evidence of these other fraudulent representations could be considered as bearing on the intent.

[5] As to the general class of testimony, which tended to show fraudulent transactions other than those specified in the indictment, the jury was told: "These matters and all these questions as to his dealings and the other facts are admitted, first, as going to the credibility of the defendant as a witness, inasmuch as he has been introduced, and thus may be considered by you as to the question of his credibility as a witness." If by this it was intended to say that the testimony of other witnesses tending to show defendant guilty of various specific frauds could be received and considered for the purpose of affecting defendant's credibility as a witness, it was, of course, erroneous; but if it was intended to say that, this evidence being rightly in the case as to the existence of the general fraudulent scheme alleged, and having over against it defendant's denial as a witness that these other

fraudulent acts occurred, the jury, if it disbelieved the defendant as to these other items, might well disbelieve him as to the specific matters directly involved, it said nothing more than this court recently approved in York v. U. S., 299 F. 778, decided June 9, 1924. We incline to construe the charge in this latter aspect, and upon the whole record we are not satisfied there was any prejudicial error in the charge in this particular.

[6] The subject of registration occupied a great part of the trial. It appears that a publication known as the "American Field," of high standing among sportsmen, maintained a department for the registration of field dogs, which it called the "Field Dog Stud Book." This is perhaps the chief registration bureau of this kind in the country, but there are others, as, for example, the "Blue Grass," "American Kennel," and "United Kennel" Stud Books. As early as 1921 the managers of the "American Field Book" concluded that some of McLendon's methods were fraudulent, and refused to register entries sent in or authenticated by him. To avoid this trouble he did some advertising and made some sales in the name of one or another dummy, and when this was later discovered these names also were put on the black list. In the case of Wooten, for example, while he was well satisfied with the bitch he bought, he found he could not get her puppies registered in the Field Dog Stud Book, because McLendon's certificate of breeding would not be accepted. There were several instances of this class.

Lacking any proof that McLendon represented that the dogs or puppies could be registered in this book, we fail to see how the mere fact that registration was refused had any lawful tendency to show the existence of the fraudulent scheme charged. Otherwise it would come about that, when the registry had a quarrel with McLendon, and with or without good cause declared his business fraudulent, it could later be shown that the business was, in fact, fraudulent because the registry had been treating it so. In McLendon's conduct we see no room for finding any representation other than that the dogs and puppies were fairly entitled to registration in any properly conducted registry, and as it is a conceded fact that this registry was refusing all his entries, right or wrong, proof of its actual refusal of a given entry was not, without more, pertinent as to the existence of the scheme charged.

[7] There must be a new trial; but there is another matter of great importance, and which alone would require reversal. After the case had been on trial several days, illness and death came to the family of a juror, and without objection this case was held over four or five days, and the eleven jurors in this case participated as they were called as jurors in the trial of other cases. No objection was made at the time to this course; but, after this jury had reconvened, and the trial had been finished and the jury charged, it remained out for parts of two days, and came back into court two or three times for further instructions. During this time a jury which had been trying a case for the unlawful sale of liquor reported that it was unable to agree. That jury had been instructed that upon the testimony of the defendant himself given in that case he was guilty, and it was their duty to return a verdict of guilty. When the jury reported its disagreement, the judge asked those jurors who were refusing to convict to arise. Six did so. Thereupon they were publicly discharged from the jury panel and the clerk was publicly instructed to see that their names were not drawn upon subsequent juries. This was for the reason, then stated in open court by the judge, that it was their legal duty to decide the case according to the evidence as produced and according to the law as given to them by the judge; that, in refusing to follow the instructions of the judge as to the verdict, these jurors had contumaciously refused to do their plain duty; and that the government ought not to continue to expend its time and money trying cases before jurors who would not be governed by the instructions of the court as to the law.

It is not clear whether this incident took place in the presence of the McLendon jury, when waiting for further instructions; but that is not material. Assuming that it had come to their knowledge, counsel asked instructions in effect that the jury should not be influenced by what had just happened in the other case. Whereupon the court repeated to this jury an account of what had happened, with his statement of his reasons for his action. Further, we may well take judicial notice, as we do, that such a happening naturally and promptly becomes known to all the jury of that term panel, except to those who are and continue to be completely sequestered. We had occasion to consider a somewhat similar incident, though less extreme, in Wolf v. U. S., 292 F. 673, 678, and Boyles v. U. S., 295 F. 126 (both decided since this trial), and held that it

necessitated a new trial of any case where it had come to the knowledge of the jury.

In view of what was said in our two former opinions just cited, and the fact that the trial of this case occurred before we had thus expressed disapproval of this practice, we refrain from extended comment. The ever-present possibility that the judge may be in error as' to the indisputable effect of the evidence and the inevitable tendency to let the jurors of the panel understand that they will be punished—though not by fine or imprisonment—if they do not agree with the judge as to the tendency of the evidence, must necessitate an immediate discharge of the entire panel whenever such an incident occurs, lest every later case at that term be subject to condemnation as a mistrial.

Many errors are alleged beyond those we have discussed. It is not likely that the questions which they involve will take the same shape upon a new trial, and accordingly we have not given them attention.

The judgment is reversed, and the case remanded for a new trial.