**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jerry R. MASTELOTTO, and Willis B. Inglesby, Defendants-Appellants.**

**Nos. 81–1678, 81–1679.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 16, 1982.

Decided May 19, 1983.

Cedric Chou, Asst. U.S. Atty., Sandra Teters, Student Intern, San Francisco, Cal., for plaintiff-appellee.

Claudia Wilken, Wilken & Leverett, Berkeley, Cal., Craig S. Cook, Salt Lake City, Utah, for defendants-appellants.

Before MERRILL, FLETCHER, and BOOCHEVER, Circuit Judges.

FLETCHER, Circuit Judge:

Mastelotto and Inglesby appeal their convictions on two counts of mail fraud in violation of 18 U.S.C. § 1341 (1976) and eight counts of wire fraud in violation of 18 U.S.C. § 1343 (1976). Each timely appealed. We have jurisdiction under 28 U.S.C. § 1291 (1976).

Defendants contend that the indictment under which they were tried is duplicitous since each of its counts alleges the defendants' participation in two independent fraudulent schemes. They further assert that, even if the indictment itself is not duplicitous, the trial court's failure to give a "same single scheme" instruction prejudiced defendants' right to a unanimous jury verdict and to be tried only for that for which they were indicted. We conclude that while the indictment is not duplicitous as drawn, the failure to give proper instructions to the jury requires reversal.

## I

This case involves allegations of numerous fraudulent transactions conducted over a ten-year period in Utah, Nevada, and California by and through three corporations engaged in the processing and sale of oil products. The evidence produced at trial related to two distinct sorts of fraudulent transactions. In the "mislabeling" transactions, oil products of the corporations were sold in containers bearing incorrect viscosity numbers or with brandnames indicating once-refined oil where the contents were in

fact re-refined oil. These misrepresentations allowed the oil to be sold at a price higher than it would bring if properly labeled, thereby increasing the profits of the corporations. In the "corporate sale" transactions, the purchaser of the assets of the corporations was not informed that the sales and cost figures of the corporations were based in part upon the sale of mislabeled oil products. These omissions induced the purchaser either to purchase more readily or to purchase at a higher price than it would otherwise have done and helped delay the discovery of the "mislabeling" transactions.

Defendants Jerry R. Mastelotto and Willis B. Inglesby were owners, directors, and officers of the companies involved in the fraudulent transactions. Bonus International Corporation (Bonus), the parent company, was located in Salt Lake City, Utah, and was engaged in the re-refining of oil products and the retail sale of re-refined oil. Inglesby was secretary, controller, and part owner of Bonus; Mastelotto was director, chief executive officer, and a 25% (and later 100%) owner of Bonus. Inglesby reported to Mastelotto.

Bonus had two refineries, one in Salt Lake City, Utah, and one in San Carlos, California. Until merging with Bonus in 1977, the latter was a subsidiary of Bonus doing business as Bayside Oil Company (Bayside).

Bonus also had two marketing arms for its petroleum products. The first, Consolidated Petrochemical Corporation (CPC), was located in Utah and was half-owned by Bonus. Mastelotto was a director and president of CPC, while Inglesby was controller, accounting supervisor, and, from September 1978 onward, an officer of CPC. The other, Lobo Oil Company (Lobo), was located in Nevada and became a wholly owned subsidiary of CPC in 1975. Mastelotto was a president and director of Lobo and Inglesby, the controller.

As early as 1970, Bonus and its subsidiaries sold motor oil to various corporations and governmental agencies in cans labeled with a viscosity rating (or "SAE" number) that did not match the actual viscosity of the oil in the cans. Changing the actual viscosity of the oil inside the can through the use of additives was more expensive than simply labeling the outside of the can to reflect the "SAE" number of oil that had been ordered.

By 1975, Bonus and its subsidiaries also were selling re-refined oil, that is, oil which has been used once and has then been filtered in a re-refining process, in drums whose labels indicated that the contents were once-refined or "virgin" oil of such major brand companies as Mobil, Chevron, and Conoco. In addition, CPC sold re-refined oil, under the Bonus label, as virgin oil. Profit margins were greater when re-refined oil was sold as virgin oil rather than as the re-refined stock it actually was.

Late in 1977, the directors of Bonus decided to find a buyer for its re-refining assets. In October, 1978, Bonus sold its re-refining assets, as well as the assets of its two subsidiaries (CPC and Lobo), to Axel Johnson Company (Johnson). Prior to the sale, the officers of Bonus (including Mastelotto and Inglesby) did not inform Johnson of the "mislabeling" transactions or tell the buyer that the Bonus sales and cost figures were based on the sale of mislabeled oil. Moreover, the evidence adduced at trial showed that Bonus employees had hidden equipment and documents which would have revealed to the purchaser the fraudulent "mislabeling" transactions in which Bonus had been engaged.

On November 18, 1980, Mastelotto and Inglesby[1] were indicted by a grand jury on twelve counts of wire fraud in violation of 18 U.S.C. §. 1343 and 18 U.S.C. § 2 and two counts of mail fraud in viola-

---

1. Mastelotto and Inglesby were indicted along with Kenneth Vierra, general manager of CPC, and J.R. Knight, manager of Lobo from 1976 onward. Vierra pleaded guilty to all counts. Knight entered into a pre-trial diversion agreement whereby he was placed on probation without being convicted.

tion of 18 U.S.C. § 1341 and 18 U.S.C. § 2.[2] The indictment comprises fifteen paragraphs: twelve describing the alleged fraudulent transactions; two setting forth, respectively, the twelve wire fraud and two mail fraud counts (the "count" paragraphs); and one incorporating the allegations of the twelve descriptive paragraphs into each of the fourteen counts contained in the two "count" paragraphs.

The third paragraph of the indictment charged that from 1969 until June 1979, the defendants

> devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises as well as omissions to state material facts. . . .

The next nine descriptive paragraphs each then explicated "a part of the scheme and artifice," including the mislabeling of oil products and the misrepresentation of the financial position and methods of operations of Bonus and its affiliates.

Following the twelve descriptive paragraphs were the two "count" paragraphs. Each of the twelve wire fraud counts charged defendants with transmitting or causing the transmission of a separate telephone call in 1978 "for the purpose of exe-

cuting the aforesaid scheme and artifice to defraud." All but one of wire fraud counts alleged an interstate phone call from Bonus in Utah to Bayside in California. The two mail fraud counts similarly charged defendants with causing two letters to be delivered in 1977 and 1978 "for the purpose of executing the aforesaid scheme and artifice to defraud."

Defendants filed various pretrial motions, all denied except for portions of the motions for bills of particular. The case proceeded to trial on April 28, 1981. The defendants' principal defense was not that the fraudulent transactions did not occur or that defendants did not have knowledge of the transactions, but that the defendants lacked intent to defraud. Mastelotto and Inglesby blamed the fraud on their subordinates, who they claimed had disobeyed repeated orders to cease the fraudulent practices.

Defendants objected to the jury instructions in advance of trial and also as given on several grounds. They particularly objected to an instruction regarding the fraudulent scheme in that they did not think "it really points out to the jury the difference between a single scheme and multiple schemes and what their effect would be."[3] While the defendants had re-

---

**2.** 18 U.S.C. § 1341 (1976) provides in pertinent part:

> Whoever, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, . . . or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
> 18 U.S.C. § 1343 (1976) states in pertinent part:
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be

transmitted by means of wire . . . communications in interstate or foreign commerce, any . . . sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 2 (1976) states a means of establishing liability but does not itself define a crime. *E.g., Baumann v. United States,* 692 F.2d 565, 571 (9th Cir.1982). It provides in pertinent part:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

**3.** The "scheme" instruction as given read:

> The indictment in this case charges one overall scheme to defraud. The government contends that the evidence shows one overall scheme to defraud. Defendants contend the evidence does not show their involvement in any scheme or schemes.
> It is for you to decide whether there was a scheme or schemes if any. Should you find

quested the addition of "a paragraph clarifying or amplifying the overall scheme language," the court concluded that it "just couldn't do it."

On July 28, 1981, the jury returned verdicts of guilty for each defendant on eight counts of wire fraud and two counts of mail fraud. Both were sentenced on October 15, 1981. Mastelotto was sentenced to three years in custody. Inglesby received a $5,000 fine and was sentenced to two years in custody with all but six months suspended and one year of probation.

## II

Mastelotto and Inglesby first challenge their convictions on the ground that the indictment was duplicitous.[4] They contend that the twelve descriptive paragraphs of the indictment, all of which were incorporated into each of the fourteen counts of the indictment, allege not merely one but two or more distinct schemes to defraud. They assert that each count charges two or more violations of sections 1341 and 1343, because each contains allegations of the use of the mails or telephone in furtherance of two or more schemes. They then conclude that since the indictment on its face sets forth in each count two or more crimes together as a single violation, the indictment must be dismissed as duplicitous. We disagree.

■ In reviewing an indictment for duplicity, our task is not to review the evidence presented at trial to determine whether it would support charging several crimes rather than just one, but rather solely to assess whether the indictment itself can be read to charge only one violation in each count. In a mail or wire fraud case, where the defendants claim a charging of multiple schemes in each count, the question for review is simply whether the indictment may be read to allege a single unified scheme in each count. See Worthington v. United States, 64 F.2d 936, 938–39 (7th Cir.1933) (claim of duplicity tested by determining whether allegations of each count in indictment may be read as part of one unitary scheme); McLendon v. United States, 2 F.2d 660, 661 (6th Cir.1924) (same).

■ In the absence of a showing of an improper charging of the grand jury, the grand jury and prosecutor must be presumed to have followed the command to charge but one crime in each count of the indictment. See Fed.R.Crim.P. 8(a). Thus, if we may fairly read the indictment to charge but one crime in each count, it must be allowed to stand and the case permitted to go to trial. See Worthington, 64 F.2d at 938.

■ The central question in a duplicity review of any given count in an indictment in a mail or wire fraud case is thus the breadth of the fraudulent activity alleged in the count, that is, whether it all falls within one unitary "scheme to defraud." Since sections 1341 and 1343 themselves place no internal limitations on scope of the term, the courts have uniformly defined the scope of a "scheme to defraud" by reference to the intent of the alleged defrauders. See, e.g., Simons v. United States, 119 F.2d 539, 547–48 (9th Cir.), cert. denied, 314 U.S. 616, 62 S.Ct. 78, 86 L.Ed. 496 (1941); Weiss v. United States, 122 F.2d 675, 680–81 (5th Cir.), cert. denied, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941); Worthington, 64 F.2d

that there was a scheme or schemes, then you must also decide whether either or both defendants were knowing participants.

In addition, if you find that there was a scheme or schemes, then before you can find a particular defendant guilty of a particular count of the indictment, you must first find that the mailing or phone call charged was in furtherance of a scheme in which that defendant was a participant.

4. Defendants timely raised objections to the alleged duplicity of the indictment in the lower court by doing so before trial as required by Fed.R.Crim.P. 12(b)(2). Cf. United States v. Henry, 504 F.2d 1335, 1339 (10th Cir.1974) (duplicity not fatally defective where defendant did not raise objection before trial, since duplicity did not "hinder the defendant in the preparation of his defense"), cert. denied, 421 U.S. 932, 95 S.Ct. 1660, 44 L.Ed.2d 90 (1975); United States v. Kelley, 395 F.2d 727, 730–31 (2d Cir.), cert. denied, 393 U.S. 963, 89 S.Ct. 391, 21 L.Ed.2d 376 (1968) (duplicity objection waived in absence of pre-trial objection).

at 938–39; *McLendon,* 2 F.2d at 661. If the set of fraudulent transactions alleged in a count is within the conceivable contemplation of a greedy mind, no duplicity has occurred.

In assessing the extent of an allegedly unitary fraudulent scheme, courts have on occasion identified various factors that test whether two or more sets of allegedly fraudulent transactions could conceivably be part and parcel of the same fraudulent scheme. *See United States v. Zemek,* 634 F.2d 1159, 1168 (9th Cir.1980) ("[r]elevant factors" for distinguishing single conspiracy from multiple conspiracies include "the nature of the scheme; the identity of the participants; the quality, frequency and duration of each conspirator's transactions; and the commonality of time and goals"), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3031, 169 L.Ed.2d 406, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341, 450 U.S. 985, 101 S.Ct. 1525, 67 L.Ed.2d 821 (1981). Since the scope of a scheme to defraud is ultimately restricted, however, only by the ingenuity of its participants, *see Weiss,* 122 F.2d at 681, these factors assume only limited importance in our review. As the Fifth Circuit has recognized,

> [t]he teaching of [the] cases as applied to the present one, is that the defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme. Naturally, by clear analogy it does not make any difference that the various deceptions were practiced at different places. Nor is it significant that the whole scheme was not planned out in advance. A continuing "intention to devise it," ... or an imperfectly conceived plan to defraud which becomes more and more sophisticated and grandiose as the plan progresses and the assets of the

more gullible victims are exhausted, may well constitute a single scheme.

*Owens v. United States,* 221 F.2d 351, 354 (5th Cir.1955).

█ We have no difficulty concluding that all of the allegedly fraudulent transactions involving the mislabeling of oil products, whether consummated through the use of an incorrect "SAE" number or by the stenciling of an incorrect brandname on a drum of oil, could be part of one single scheme to defraud.[5] Concluding that the "corporate sale" transactions and the "mislabeling" transactions could be part of a unitary scheme also poses no problem. Under one reading of the indictment, the misrepresentations and other fraudulent activity involved in the "corporate sale" transactions are part of the "cover-up" necessary for the success of any fraudulent scheme. The defendants' cover-up of the past mislabeling practices incident to the sale of the re-refining assets could simply have been to ensure that the fraudulent scheme centered on the "mislabeling" transactions was not discovered.

█ Even if we were to conclude, however, that some of the "corporate sale" transactions were not part of a post hoc cover-up of a scheme centered on the "mislabeling" transactions, the indictment would not be void for duplicity. The misrepresentations and other fraudulent activity of the defendants directed toward the assets purchasers could have been part of a larger, more comprehensive scheme to profit by deceiving the purchasers of both oil and assets, whereby the defendants initially sought to increase the profits of Bonus and its affiliates by fraudulent means and then sought to mislead the purchasers both to

---

5. *Cf. Simons v. United States,* 119 F.2d 539, 547–48 (9th Cir.) (indictment charging various fraudulent transactions designed to attract investors held not duplicitous), *cert. denied,* 314 U.S. 616, 62 S.Ct. 78, 86 L.Ed. 496 (1941); *United States v. MacAlpine,* 129 F.2d 737, 739–40 (7th Cir.1942) (indictment charging transactions defrauding several different holders of whiskey warehouse receipts held not duplicitous); *Weiss v. United States,* 122 F.2d 675, 681 (5th Cir.1941) (indictment charging scheme consisting of fraudulent price increase in government contract and, a year later, fictitious claim for extra work held not duplicitous), *cert. denied,* 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941).

sell the assets at a higher price and to conceal the past misdeeds.[6]

■ Since our role in the review of an indictment is limited to determining whether the charges of the indictment under each count might be proved at trial, not whether the evidence adduced at trial supports conviction, we have no basis to dismiss the indictment in this case.[7]

### III

The defendants next challenge their convictions on the ground that, even if the indictment itself was not duplicitous, the proof presented at trial demonstrated the existence of two or more distinct schemes to defraud. They contend that this difference between the single scheme alleged in the indictment and the evidence produced at trial that demonstrates the existence of several schemes to defraud constitutes a fatal variance. They would be convicted of mail fraud in respect to a scheme not charged in the indictment. They further contend that if the proof presented at trial was susceptible of interpretation either as a single scheme or multiple schemes, the variance is still fatal because we cannot be sure that all the jurors found the existence of the single scheme charged in the indictment.

■ When a potential variance has been properly objected to at trial, the reviewing court must answer two questions in the affirmative before a conviction can be sustained. First, the appellate court must decide that the evidence concerning the fraudulent transactions was sufficient to permit the question of the existence of one unitary fraudulent scheme to go to the jury. Moreover, even if the evidence adduced was sufficient to submit the question of a single scheme to the jury, before sustaining the conviction, the court must conclude either (1) that the jury was properly instructed that it had to agree unanimously upon the existence of the same single scheme to defraud that was charged in the indictment, or (2), if the jury was improperly instructed, that giving the improper instruction was nonetheless harmless error.

### A

■ The first question posed by the contention of variance between indictment and proof is essentially one of sufficiency of the evidence. *Kotteakos v. United States,* 328 U.S. 750, 767–68, 66 S.Ct. 1239, 1249–1250, 90 L.Ed. 1557 (1946); *United States v. Kenny,* 645 F.2d 1323, 1335 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981). The evidence need not exclude every hypothesis but that of a single unitary scheme to defraud, but rather must simply be sufficient to support a finding of such a scheme. *Kenny,* 645 F.2d at 1335. The critical inquiry is therefore "whether, after viewing the evidence in the light most favorable to the prosecution, *any*

---

**6.** *See Owens v. United States,* 221 F.2d 351, 355 (5th Cir.1955) (indictment charging habitual use of differing fraudulent techniques even over a long period on numerous victims in many different places not duplicitous, since all activity could be part of a "single fraudulent scheme").

**7.** Defendants contend that the indictment was flawed not only for duplicity but also because the grand jury which indicted in this case had been improperly constituted in violation of the Fifth and Sixth Amendments and the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1876. Defendants assert that the trial court committed reversible error by failing to hold an evidentiary hearing on this claim. Defendants are incorrect.

Under the federal rules, an objection based on defects "in the institution of the prosecution" or "in the indictment," including the constitution of a grand jury, must be raised prior to trial. Fed.R.Crim.P. 12(b)(1), (2), & advisory committee note. Failure to raise the objection prior to trial "shall constitute waiver thereof." Fed.R.Crim.P. 12(f). For "cause shown," a trial court may, in its discretion, grant relief from the waiver. *Id.*

On July 9, 1981, well into the trial and after the government had rested its case in chief, Mastelotto filed a motion, later joined by Inglesby, challenging the constitution of the grand jury. After considering the defendants' numerous arguments but without holding a hearing, the trial court denied the motion.

The defendants have not stated either at trial or on appeal any "cause" for not objecting prior to trial. Absent such a showing, the trial court committed no error in failing to grant an evidentiary hearing on defendants' jury constitution claim, for that claim had been waived by inexcusable delay. *See* Fed.R.Crim.P. 12(f).

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). As in *Kenny,* "this court would have to be able to say that *no* rational trier of fact could have found a single [scheme to defraud] on this evidence before we could disturb the jury's finding, implicit in its guilty verdict, that a single [scheme] had been proved." 645 F.2d at 1335 (emphasis in original) (conspiracy case).

■ Our review of the evidence convinces us that while a rational juror could have concluded that the "mislabeling" transactions and "corporate sale" transactions were part of two distinct and unrelated schemes to defraud, a rational juror could also have found that all of the fraudulent activity revealed by evidence adduced at trial was part of the one unitary scheme to defraud alleged in the indictment. Certainly, a reasonable juror could have found that all of the evidence of fraudulent activity involved in the "corporate sale" transactions merely indicated a passive "cover-up" of a fraudulent scheme centered on the mislabeling of oil products.

Yet, a juror would not have had to conclude that all of the evidence presented at trial indicated merely such a "mislabeling" scheme and its cover-up. Our review of the evidence indicates that a reasonable juror could have found a broader scheme, centered on fraudulent activity conducted by and through Bonus and its affiliates, that encompassed the mislabeling of oil products *and* the deception of the purchaser of the Bonus assets, both as means of increasing the profits of Bonus and of its owners upon sale of the business. To be sure, the evidence of the "corporate sale" transactions showed that the misrepresentations involved in that activity were in some ways different from those in the "mislabeling" transactions. They were directed at a dif-

ferent sort of recipient (a purchaser of corporate assets rather than the purchasers of oil products), had a different qualitative content (nondisclosure of the source of corporate profits rather than misrepresentation of the nature of an oil product), induced the sale of a different variety of property (re-refining assets rather than oil products), and took place in different time frames (early 1978 rather than 1969 through 1978). Nevertheless, we conclude that enough elements are common to the two groups of transactions to allow the jury to decide whether there was a single scheme to defraud. If the jury were properly instructed, the problem of potential variance could be avoided. *See Kenny,* 645 F.2d at 1336 (no variance, where evidence sufficient and proper instructions given); *United States v. Lutz,* 621 F.2d 940, 943 (9th Cir.1980) (same), *cert. denied,* 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75, 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981).

B

■ We now consider the adequacy of the jury instructions.[8] In a mail or wire fraud case in which a defendant contends that a variance has occurred between the single scheme charged in each count of the indictment and the proof at trial, the jury must be instructed that each of the jurors must find the defendant guilty of participation in the same single scheme to defraud *and* that the scheme to defraud in which the defendant is found to have participated is the same scheme as the overall fraudulent scheme alleged in the indictment.

■ If the jurors are not instructed that they must all agree on the existence of the same scheme to defraud, the defendant's right to a unanimous jury verdict as guaranteed by article III, § 2 of and the sixth amendment to the United States Constitution is infringed. *United States v. Echeverry,* 698 F.2d 375, 377 (9th Cir.1983). The

8. The government contends that the defendants failed to preserve this issue for review. However, Mastelotto's counsel proposed a specific paragraph addition to the court's intended instruction and, when it was refused, counsel for

both defendants objected on the specific basis on which we reverse. We find that Mastelotto and Inglesby did adequately object to the instruction as given.

requirement of trial by jury demands not merely agreement among the jurors that the defendant did participate in some scheme to defraud, whatever the scheme, but also unanimous agreement that the defendant participated in one particular fraudulent scheme.

■ Moreover, without an instruction requiring the jury to convict as to a count only if it finds that the single overall scheme charged in that count existed and that the defendant participated in that scheme, the defendant's right to be "held to answer" only for a crime of which he has previously been indicted by a grand jury, as guaranteed by the fifth amendment to the United States Constitution, is violated. *See Ex parte Bain,* 121 U.S. 1, 7, 7 S.Ct. 781, 784, 30 L.Ed. 849 (1887); *United States v. Pazsint,* 703 F.2d 420 (9th Cir.1983); *Edgerton v. United States,* 143 F.2d 697, 699 (9th Cir.1944). "After an indictment has been returned, its charges may not be broadened through amendment—whether it be by physical alteration, jury instruction, or bill

of particulars—except by the grand jury." *Pazsint,* 703 F.2d at 423.

■ In instructing the jury, the court may, of course, correct typographical or clerical errors in the indictment or refuse to require the jury to find the existence of facts that are not necessary elements of the statutory offense, as long as the petit jury is still required by the instructions to find all of the elements of the crime upon which the grand jury based its indictment.[9] The trial court is not free, however, to alter the crime charged through an instruction that changes the conduct that must be found as a necessary element of the offense from the conduct set forth in the indictment, for we cannot be certain that the grand jury would have indicted on the altered basis. *Stirone v. United States,* 361 U.S. 212, 215–19, 80 S.Ct. 270, 272–274, 4 L.Ed.2d 252 (1959); *Ex parte Bain,* 121 U.S. at 10, 71 S.Ct. at 786; *Pazsint,* 703 F.2d at 423; *United States v. Stewart Clinical Laboratory, Inc.,* 652 F.2d 804, 807 (9th Cir.1981); *Edgerton,* 143 F.2d at 699.[10] A defendant cannot be convicted

**9.** *See, e.g., Heisler v. United States,* 394 F.2d 692 (9th Cir.) (typographical error) (jury instructions permitting conviction on basis of passing $20 bill rather than $10 bill alleged in indictment upheld, since bill had been identified by serial number), *cert. denied,* 393 U.S. 986, 89 S.Ct. 463, 21 L.Ed.2d 448 (1968); *Ford v. United States,* 273 U.S. 593, 602, 47 S.Ct. 531, 534, 71 L.Ed. 793 (1927) (unnecessary element) (jury instruction not requiring jury to find violation of treaty as element of conspiracy upheld, even though indictment alleged such violation as part of charged conspiracy, since violation of treaty was not offense against United States); *see also United States v. Dawson,* 516 F.2d 796, 801–03 & nn. 3–6 (9th Cir.) (collecting cases), *cert. denied,* 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 80 (1975).

**10.** *United States v. Abascal,* 564 F.2d 821, 832 (9th Cir.1977), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1583, 55 L.Ed.2d 804 (1978); *United States v. Hobson,* 519 F.2d 765, 774 (9th Cir.), *cert. denied,* 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975); and *United States v. Dawson,* 516 F.2d 796, 804 (9th Cir.), *cert. denied,* 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 80 (1975), in which we stated in general terms that the trial court can refuse to instruct on an allegation of an indictment as long as the remaining allegations charge an offense, do not hold otherwise. In those cases, the failure of the jury instructions to require the jury to find

the existence of a particular allegation of the indictment did not prejudice the defendant, since it was certain that, even without the deleted allegation, the grand jury would have indicted on the charge at issue.

In *Abascal,* for example, the original indictment charged the defendant with knowingly conspiring both to import *and* to distribute cocaine, 564 F.2d at 831–32; thus, permitting the jury to convict solely by finding a conspiracy to distribute, *see* 564 F.2d at 832, did not prejudice the defendant, since the grand jury itself obviously would have indicted on the basis solely of a conspiracy to distribute. Similarly, in *Hobson,* the indictment charged defendant with providing an escaped prisoner with food, clothing, and a gun, whereas the jury was permitted to convict even if it found the defendant to have supplied only food or clothing or a gun. *See* 519 F.2d at 774. The conjunctive charge in the *Hobson* indictment, indicating that the grand jury thought that the defendant had provided *all* three items, permitted instructions allowing conviction for providing only one of the items. Finally, in *Dawson,* the defendants were not prejudiced by an instruction requiring the jury to find the existence of a promise of money with intent to influence the testimony of a witness in trial 1, where the indictment had charged a promise of money with intent to influence the testimony of a witness in both trial 1 *and* trial 2. *See* 516 F.2d at 799.

of a count charging participation in a fraudulent scheme Y where the grand jury indicted based on his participation in a fraudulent scheme X, even if the schemes themselves overlap or are concentric. Since the grand jury cannot be assumed to have indicted based on the defendant's participation in the overlapping or common portions of the schemes, an instruction requiring the petit jury to find the defendant to have participated in the overall scheme alleged by the grand jury is necessary in any mail or wire fraud case.[11] See Stirone, 361 U.S. at 217, 80 S.Ct. at 273.

■ The jury instructions given in this case were flawed. Not only did they fail to require each of the jurors to agree unanimously on the same single scheme as charged to convict, but they also affirmatively stated that, even if any particular juror did find the existence of several "schemes," the juror could nonetheless vote

---

Here, by contrast, failure to instruct the jury to convict only on the entire fraudulent scheme crime as charged could have resulted in the petit jury's verdict of guilty for a crime for which it is not certain the grand jury would itself have indicted the defendant. The crucial difference between a mail or wire fraud case such as this and a case like *Abascal* is that in a mail or wire fraud case the grand jury indicts *not* simply on the basis of defendant's *agreement* to commit crime A and crime B, but rather on the basis of defendant's causing the use of the phone or mails in furtherance of a scheme involving activity A and activity B. While the former basis enables us to be certain, in retrospect, that the grand jury would have indicted simply on the basis of an agreement to commit crime B, the latter basis does not permit us to be certain that the grand jury would have charged defendant with "causing" the use of the mails or phone in furtherance of a scheme involving only activity B. The grand jury indicting on mail or wire fraud may have indicted simply on the basis that the defendant's participation in activity B sufficiently "caused" the use of the mails or phone in furtherance of a scheme involving both activity B and activity A, even though it would not have indicted for mail or wire fraud based on a scheme involving only activity A. By contrast, a grand jury indicting for conspiracy must have determined that the defendant agreed to all of the alleged activity.

11. Cf. United States v. Lutz, 621 F.2d 940, 943 (9th Cir.1980) (mail fraud conviction affirmed where jury instructed "that it had to find ... [the existence of] the single fraudulent scheme alleged in the indictment"), cert. denied, 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75, 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981); United States v. Thomas, 586 F.2d 123, 132 (9th Cir.1978) (conspiracy conviction affirmed where jury "specifically admonished that if 'two or more separate conspiracies have been proven, rather than the single conspiracy charged in the indictment, then [it] must acquit' "); United States v. Abushi, 682 F.2d 1289, 1299–1300 (9th Cir.1982) (conspiracy conviction affirmed where jury required to find each defendant's participation in the "single conspiracy ... charged in the indictment"); United States v. Perry, 550 F.2d 524, 533 (9th Cir.) (dictum) (conviction could be affirmed where jury instructed that it had to find each defendant's participation in "general conspiracy charged"), cert. denied, 434 U.S. 827, 98 S.Ct. 104, 54 L.Ed.2d 85 (1977). But cf. United States v. Echeverry, 698 F.2d 375, 377 (9th Cir.1983) (dictum) (conspiracy conviction could be affirmed if jury agreed on a conspiracy of some duration even if not the same seven-month conspiracy as charged in indictment).

United States v. Beecroft, 608 F.2d 753, 757 (9th Cir.1979), and United States v. Outpost Development Co., 552 F.2d 868, 869–70 (9th Cir.), cert. denied, 434 U.S. 965, 98 S.Ct. 503, 54 L.Ed.2d 450 (1977), in which we sustained mail fraud convictions after ascertaining that at least some but not necessarily all of the misrepresentations charged were in fact fraudulent, do not hold otherwise. In both cases, the issue on appeal was not whether the jury had to find the existence of the unitary scheme that was charged in the indictment but simply whether the evidence that was adduced was sufficient for the jury to find that the scheme charged was fraudulent. See Beecroft, 608 F.2d at 757; Outpost, 552 F.2d at 870. In each case, the court concluded that as long as there was evidence of some fraudulent statements, the jury could reasonably have found the existence of a fraudulent scheme. Beecroft, 608 F.2d at 757 ("[p]roof of any one or more of the fraudulent representations" is sufficient "to prove a fraudulent scheme"); Outpost, 552 F.2d at 870 ("[w]ith respect to [one] allegation [of misrepresentation] the evidence is more than sufficient to sustain the verdict"). Neither case discusses jury instructions, and neither gainsays that the jury must, in any event, find the existence of a fraudulent scheme substantially as broad as that charged by the grand jury, even if it does conclude that not every particular alleged misrepresentation was in fact fraudulent. See United States v. Joyce, 499 F.2d 9, 22 (7th Cir.1974) (advocating instructing the jury that it must find "that the scheme alleged was actually set up," even if not all of particular pretenses and misrepresentations alleged in the indictment are in fact proven).

for conviction if the mailing or phone call charged was in furtherance of at least "a scheme in which that defendant was a participant." The instructions required neither unanimity nor a finding of the existence of the charged scheme.

Under the facts of this case, we cannot find the errors harmless. *See* Fed.R. Crim.P. 52(a); *United States v. Stewart Clinical Laboratory, Inc.,* 652 F.2d 804, 809 (9th Cir.1981); *Heisler v. United States,* 394 F.2d 692, 694 (9th Cir.), *cert. denied,* 393 U.S. 986, 89 S.Ct. 463, 21 L.Ed.2d 448 (1968).

█ Since the jurors were not instructed that they had to agree unanimously on the existence of the same single scheme to defraud, we cannot be certain that the defendants' substantial right to a unanimous jury verdict was not affected. Some portion of the jury, in casting a guilty ballot, may have envisioned defendants' participation solely in a scheme encompassing only the "mislabeling" transactions, whereas other jurors may have envisioned a broader scheme, encompassing both the "mislabeling" and the "corporate sale" transactions. The former group of jurors, having determined that *two* schemes in fact existed or that the fraudulent activity extended no farther than the "mislabeling" transactions, may well have been unwilling and unable to find that the defendants caused the use of the mails or phone in furtherance of one unitary scheme encompassing all of the fraudulent transactions. They may have decided that defendants caused the use of the mails and telephone in furtherance of a "mislabeling" scheme but not in furtherance of one encompassing all of the alleged fraudulent activity. On the other hand, other jurors, in reaching a determination of the defendants' guilt as to each count, may have determined that there was only one general scheme involving all of the transactions and that each defendant knowingly participated in that unitary scheme only by seeking to ensure the sale of the Bonus assets. This group of jurors may have concluded that the defendants' participation in the fraudulent sale of the Bonus assets sufficiently involved them in the overall fraudulent scheme so that they could be said to have "caused" the use of the phone or mails in furtherance of that overall scheme.[12] These same jurors may have been unwilling and unable to find, however, that the evidence presented was sufficient to show the defendants caused the use of the phone or mails in furtherance of a scheme encompassing only the "mislabeling" transactions.

█ Moreover, even if the instructions here had required the jurors to agree unanimously on the existence of the same single scheme to defraud, the instructions are flawed for another reason. By affirmatively telling the jurors that they need not find the existence of the overall scheme charged in the indictment as long as they found the defendant to have participated in "a scheme," the instructions prejudiced defendants' right to be convicted only of those charges for which they had previously been indicted by a grand jury. The instructions, as given, told the jurors in effect that they could convict each of the defendants for participating in a scheme to defraud even though substantially different from the unitary overall scheme charged by the grand jury. The petit jury could have voted for a conviction based on a scheme comprising *only* the "mislabeling" transactions and none of the fraudulent activity related to the "corporate sale" transactions, a scheme substantially different from the broader overall scheme upon which the defendant was indicted. While concluding that no overall scheme existed, the jury could have voted to convict, having found sufficient evidence that the defendant caused the use of the mails and phone in furtherance of a

---

**12.** Under the broad standard of causation set forth by the Court in *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1953), a defendant may be found guilty of causing the use of the mails or phone in furtherance of a fraudulent scheme even if he has no actual knowledge or intent regarding the use of the mails or phone, as long as it could reasonably be expected that the mails or phone were in some manner to be used in furtherance of the scheme and the mails are in fact used. *See also United States v. Beecroft,* 608 F.2d 753, 757 (9th Cir.1979); *United States v. Dondich,* 506 F.2d 1009, 1010 (9th Cir.1974).

more narrow, "mislabeling" scheme. Yet the grand jury, having charged on the basis of a broader overall scheme, involving numerous persons, may have indicted the defendant for causing the use of the phone and mails in furtherance of the overall scheme based largely on his actions in the "corporate sale" transactions. The grand jury might have been unwilling and unable to return an indictment based solely on defendant's participation in a more narrow "mislabeling" scheme, even though it had concluded that the defendant, by participating in the sale of the re-refining assets, had sufficiently "caused" the use of the mails or phone in furtherance of a scheme encompassing all the activity alleged in the indictment to permit handing down an indictment based on the overall scheme. *See Stirone v. United States,* 361 U.S. 212, 217, 219, 80 S.Ct. 270, 273, 274, 4 L.Ed.2d 252 (1960). As instructed, the jury could have convicted defendants for a crime for which they would not have been indicted by a grand jury of their peers.[13]

We are not free to hypothesize whether each of the jurors indeed agreed to and was clear on the scope of the scheme upon which the verdict of guilt was rendered. *United States v. Echeverry,* 698 F.2d 375, 377 (9th Cir.1983); *see Ex parte Bain,* 121 U.S. 1, 7,

7 S.Ct. 781, 784, 30 L.Ed. 849 (1887). Thus, we cannot say beyond a reasonable doubt that the failure to instruct did not affect the verdict. The case must be retried.

### IV

We reverse the defendants' judgments of convictions on all counts and remand for a new trial.[14]

---

**13.** *Salinger v. United States,* 272 U.S. 542, 548–49, 47 S.Ct. 173, 175, 71 L.Ed. 398 (1926), in which the Court upheld the giving of an instruction permitting the jury to convict without finding the existence of all of the fraudulent activity alleged in the indictment, does not require an opposite conclusion here. First, as we explained in *Edgerton v. United States,* 143 F.2d 697, 699 (9th Cir.1944), *Salinger* stands not for proposition that the trial court may amend an indictment in any manner as long as the indictment still charges some crime, but rather as a "reaffirmation of the principle that a count cannot be stricken in part as distinguished from a dismissal of the whole count." Furthermore, in *Salinger,* the defendant himself, after the prosecution had rested, "believing that part of the charge had no support in the evidence, requested that that part be withdrawn from the jury; and the court acceded to the request when the final instructions were given." 272 U.S. at 548, 47 S.Ct. at 175. *Salinger,* in any event, does not control the case where, as here, explicit consent to such a late amendment of the indictment, after the presen-

tation of the prosecution's case, is lacking. Finally, in *Salinger,* the possibility of prejudice to defendant's rights, because the petit jury may have convicted the defendant for a crime of which it is not certain the grand jury would have indicted, was neither raised nor discussed. *See* 272 U.S. at 548–59, 71 S.Ct. at 175.

**14.** Defendants further challenge their convictions on the following grounds: (1) erroneous admission of evidence of similar "bad acts"; (2) insufficiency of the evidence; (3) inadequacy of the aiding and abetting instruction; (4) restriction of defendants' cross-examination of an accomplice witness; (5) failure to dismiss counts 3 and 4 of the indictment; (6) failure to caution the jury regarding the testimony of the accomplice witness; (7) failure to hold a hearing on alleged prosecutorial misconduct; and (8) juror misconduct. On the record before us, the first seven objections do not present grounds for reversal. In light of the disposition herein, we need not reach the defendants' assertion of juror misconduct affecting defendants' sixth amendment rights.